# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### AT HUNTINGTON

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

MATTHEW MALLORY,
CAMO HEMP WV LLC,
GARY KALE, GRASSY RUN
FARMS, LLC, their agents,
servants, assigns, attorneys, and all
others acting in concert with the
named defendants,

      Defendants.

Civil Action No. 3:18-cv-01289

## VERIFIED COMPLAINT FOR DECLARATORY RELIEF; TEMPORARY, PRELIMINARY, AND PERMANENT INJUNCTIVE RELIEF; ASSET FORFEITURE; AND CIVIL PENALTIES

### I. INTRODUCTION

1.    The United States of America (hereinafter "United States"), by its undersigned attorneys, brings this action under the Controlled Substances Act (hereinafter "the CSA"), 21 U.S.C. § 801, *et seq.*, and other related federal statutes and federal law, for declaratory relief, a temporary restraining order, preliminary and permanent injunctive relief, asset forfeiture, and civil penalties and damages arising out of defendants Matthew Mallory, CAMO HEMP WV LLC, Gary Kale, Grassy Run Farms, LLC, and all those acting in concert with those named defendants in the ongoing manufacture, possession, and distribution of marijuana, a Schedule I controlled substance, and possession of marijuana with the intent to manufacture and distribute the substance in violation of 21 U.S.C. § 841(a)(1); and defendants Matthew Mallory, CAMO HEMP WV LLC, Gary Kale, Grassy Run Farms, LLC, and all those acting in concert with those

named defendants acting in an ongoing conspiracy to violate the Act, in violation of 21 U.S.C. § 846.

2.       The United States also seeks temporary, preliminary, and permanent injunctive relief pursuant to Fed.R.Civ.P. 65 and 21 U.S.C. §§ 843(f), 856(e), 882(a).

3.       The United States also seeks remedies and damages relating to civil and other types of forfeiture pursuant to 18 U.S.C. §§ 981, *et seq.*, and 21 U.S.C. § 881.

4.       The United States also seeks civil penalties and damages pursuant to 21 U.S.C. § 856(d).

## II. JURISDICTION AND VENUE

5.       This action arises out of violations of 21 U.S.C. § 801, *et seq.*; 21 U.S.C. §§ 843(f), 856(e), 882(a) which authorize temporary, preliminary, and permanent injunctive relief; 28 U.S.C. §§ 2201 and 2202 which authorizes declaratory relief; 18 U.S.C. §§ 981, *et seq.*, and 21 U.S.C. § 881 which authorize civil forfeiture; and 21 U.S.C. § 856(d) which authorizes civil penalties and damages for the violations of the Act alleged herein.

6.       This court has jurisdiction pursuant to 18 U.S.C. §§ 981, 985; 21 U.S.C. §§ 881, 882(a); and 28 U.S.C. §§ 1331, 1345, and 1355.

7.       Venue is proper pursuant to 28 U.S.C. § 1391(b).

## III. PARTIES

8.       The plaintiff is the United States of America (hereinafter "United States").

9.       Matthew Mallory (hereinafter "Mallory") is the proprietor of a business named CAMO HEMP WV LLC (hereinafter "CAMO"), an alleged business entity of unknown origin, and not registered with the Office of the Secretary of State of West Virginia.

10.     Gary Kale ("Kale") is an employee and/or agent for Grassy Run Farms, LLC ("Grassy Run"), and the Schedule I controlled substance which is the subject of this action has been grown, manufactured, and produced on property owned and/or controlled by Grassy Run Farms, LLC.

### IV.  LEGAL BACKGROUND—THE CONTROLLED SUBSTANCES ACT

11.     The Controlled Substances Act ("CSA"), 21 U.S.C. § 801, *et seq.*, establishes a comprehensive federal scheme to regulate controlled substances.  The CSA makes it unlawful to "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense" any controlled substance, "[e]xcept as authorized by [21 U.S.C. §§ 801–904]." 21 U.S.C. § 841(a)(1).  Under the CSA, "manufactur[ing]" includes "production," 21 U.S.C. § 802(15), which includes "planting, cultivation, growing, or harvesting" a controlled substance, 21 U.S.C. § 802(22).  The CSA makes it a crime to possess any controlled substance except as authorized by the CSA.

12.     The CSA establishes "a 'closed' system of drug distribution for legitimate handlers" of controlled substances.  H.R.Rep. No. 91–1444, at p. 6 (1970), as reprinted in 1970 U.S.C.C.A.N. 4566, 4571–72.  To effectuate that closed system, the CSA "authorizes transactions within 'the legitimate distribution chain' and makes all others illegal." United States v. Moore, 423 U.S. 122, 141, 96 S.Ct. 335, 46 L.Ed.2d 333 (1975) (quoting H.R.Rep. No. 91–1444 (1970)).  The restrictions the CSA places on the manufacture, distribution, and possession of a controlled substance depend upon the "schedule" in which the drug has been placed.  See 21 U.S.C. §§ 821–29.

13.     The CSA establishes five "schedules" of controlled substances differentiated by the scheduled drug's potential for abuse, its usefulness in medical treatment, and the potential

consequences if abused. 21 U.S.C. § 812(b).  A controlled substance is listed in Schedule I, the most restrictive schedule, if it has "a high potential for abuse," "no currently accepted medical use in treatment in the United States," and "a lack of accepted safety for use ... under medical supervision."  21 U.S.C. § 812(b)(1).  Under the CSA, any person who seeks to manufacture, distribute, or possess a Schedule I controlled substance must apply for and obtain a certificate of registration from the Drug Enforcement Agency ("DEA"). 21 U.S.C. §§ 822–23.  When evaluating an application to manufacture a Schedule I substance, the DEA is required to consider such factors as the applicant's "maintenance of effective controls against diversion," "past experience in the manufacture of controlled substances," and criminal history.  21 U.S.C. § 823(a).

14.     Since Congress enacted the CSA in 1970, "marijuana" (or "marihuana") and tetrahydrocannabinols (THC) have been classified as Schedule I controlled substances.  See Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. No. 91–513, § 202, 84 Stat. 1249 (schedule I(c)(10), (17)); 21 U.S.C. § 812(c) (Schedule I(c)(10), (17)).  "Marijuana" is defined under the CSA to include "all parts of the plant Cannabis sativa L." except certain components of the plant such as mature stalks, fiber produced from the stalks, sterilized seeds, and oil from the seeds. 21 U.S.C. § 802(16).

15.     The CSA contains congressional findings regarding the effects of drug distribution and use on the public health and welfare, and the effects of drug activity on interstate commerce. Congress found that "[t]he illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people." 21 U.S.C. § 801(2).  Congress then found:

(3) A major portion of the traffic in controlled substances flows through interstate and foreign commerce. Incidents of the traffic which are not an integral part of the interstate or foreign flow, such as manufacture, local distribution, and possession, nonetheless have a substantial and direct effect upon interstate commerce because--

(A) after manufacture, many controlled substances are transported in interstate commerce,

(B) controlled substances distributed locally usually have been transported in interstate commerce immediately before their distribution, and

(C) controlled substances possessed commonly flow through interstate commerce immediately prior to such possession.

21 U.S.C. § 801(3).

16.    Congress further found that "[l]ocal distribution and possession of controlled substances contribute to swelling the interstate traffic in such substances." 21 U.S.C. § 801(4); that "[c]ontrolled substances manufactured and distributed intrastate cannot be differentiated from controlled substances manufactured and distributed interstate" and "[t]hus, it is not feasible to distinguish" between such substances "in terms of controls," 21 U.S.C. § 801(5); and that "[f]ederal control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents of such traffic." 21 U.S.C. § 801(6).

17.    Under the CSA, marijuana is designated as a Schedule I controlled substance. 21 U.S.C. § 812 (Schedule I)(c)(10). The CSA defines "marijuana" as follows:

[A]ll parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin. Such term does not include the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination.

21 U.S.C. § 802(16). This definition of "marijuana" unambiguously includes the Cannabis sativa L. plant and does not in any manner differentiate between Cannabis plants based on their THC concentrations. Although the definition does exclude certain components of the plant, it is clear that a growing Cannabis plant falls within the definition of "marijuana."

18.     In addition, the CSA designates "any material ... which contains any quantity of ... [t]etrahydrocannabinol[ ][THC]" as a Schedule I controlled substance. 21 U.S.C. § 812 (Schedule I)(c)(17). See also 21 U.S.C. § 881(g)(1) ("All species of plants from which controlled substances in schedules I and II may be derived which have been planted or cultivated in violation of this subchapter ... may be seized and summarily forfeited to the United States"). The CSA makes no distinction between cannabis grown for drug use and that grown for industrial use. 21 U.S.C. § 802(16). See also United States v. Sifuentes, 504 F.2d 845, 849 (4th Cir. 1974) (the CSA applies to all species of cannabis).

19.     The CSA likewise makes no distinction between cannabis grown for drug use and that grown for industrial use. "Industrial" or "commercial" hemp is subject to regulation as a Schedule I controlled substance under the CSA because as a species of Cannabis sativa L., it falls squarely within the definition of marijuana set forth in the CSA. The language of the CSA unambiguously bans the growing of marijuana, regardless of its use. The legislative history of the CSA makes it clear that the CSA bans the growth of all varieties of the Cannabis sativa L. plant absent compliance with the registration requirements of the CSA. See Monson v. Drug Enforcement Administration, 589 F.3d 952, 961-62 (8th Cir. 2009).

## V.  LEGAL BACKGROUND—THE LIMITED EXCEPTION CREATED BY THE AGRICULTURE ACT OF 2014

20.     In the Agricultural Act of 2014, Congress created a special exception to the CSA to allow states to enact laws to allow certain institutions of higher education and state

departments of agriculture to grow or cultivate "industrial hemp" for research purposes or as part

of an agricultural pilot program in which the "industrial hemp" is grown for agricultural or

academic research. This exception was codified at 7 U.S.C. § 5940:

(a) In general

Notwithstanding the Controlled Substances Act (21 U.S.C. 801 *et seq.*), chapter 81 of Title 41, or any other Federal law, an institution of higher education (as defined in section 1001 of Title 20) or a State department of agriculture may grow or cultivate industrial hemp if--

(1) the industrial hemp is grown or cultivated for purposes of research conducted under an agricultural pilot program or other agricultural or academic research; and

(2) the growing or cultivating of industrial hemp is allowed under the laws of the State in which such institution of higher education or State department of agriculture is located and such research occurs.

(b) Definitions

In this section:

(1) Agricultural pilot program

The term "agricultural pilot program" means a pilot program to study the growth, cultivation, or marketing of industrial hemp--

(A) in States that permit the growth or cultivation of industrial hemp under the laws of the State; and

(B) in a manner that--

(i) ensures that only institutions of higher education and State departments of agriculture are used to grow or cultivate industrial hemp;

(ii) requires that sites used for growing or cultivating industrial hemp in a State be certified by, and registered with, the State department of agriculture; and

(iii) authorizes State departments of agriculture to promulgate regulations to carry out the pilot program in the States in accordance with the purposes of this section.

(2) Industrial hemp

The term "industrial hemp" means the plant Cannabis sativa L. and any part of such plant, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis.

(3) State department of agriculture

The term "State department of agriculture" means the agency, commission, or department of a State government responsible for agriculture within the State.

Id.

21.     Under this limited exception, the grower must be (1) an institution of higher education as defined by certain federal statutes; (2) state department of agriculture; or (3) a person or entity growing the industrial hemp under the auspices of a state department of agriculture pilot program.  81 Fed.Reg. 53395-96 (Aug. 12, 2016) (a copy of which is attached as Exhibit A to this complaint).

22.     Such a program has various constraints and limitations.  For example, the growth and cultivation of industrial hemp can only take place in accordance with an agricultural pilot program to study the growth, cultivation, or marketing of industrial hemp as established by a state department of agriculture or a state agency where the production of industrial hemp is otherwise legal; hemp plants and seeds may not be transported across state lines; the person growing the hemp must be licensed, registered and authorized to conduct research under the agricultural pilot program; the plant and its derivatives must have a very limited THC level. Other constraints and limitations also exist.  Despite the limited exception permitted under 7 U.S.C. § 5490, any person or entity who fails to meet these licensing and registration qualifications, the conditions and constraints imposed by the state programs, and the limitations

8

prohibiting transportation of hemp products and seeds across state lines are subject to the CSA. 81 Fed.Reg. 53395-96 (Aug. 12, 2016) (Exhibit A attached to this complaint).  See also Exhibit F attached to this complaint.

23.     The limited exception to the CSA created by 7 U.S.C. § 5940 does not alter the requirements of the CSA that apply to the manufacture, distribution, and dispensing of products containing controlled substances.  Persons and entities who manufacture, distribute, or dispense products derived from cannabis plants are still subject to and must adhere to the legal duties and conditions imposed by the CSA.  81 Fed.Reg. 53395-96 (Aug. 12, 2016).

## VI.  FACTUAL BACKGROUND

24.     Mallory filed an Application for Research and Marketing Cultivation of Industrial Hemp with the West Virginia Department of Agriculture on April 26, 2018.  He listed the "Business Name" as "CAMO HEMP WV LLC."  See Exhibit B attached to this complaint. Mallory received a license to participate in the West Virginia industrial hemp pilot program.  For unknown reasons, that license is dated as being issued prior to the filing of the Application for Research and Marketing Cultivation of Industrial Hemp with the West Virginia Department of Agriculture on April 26, 2018.  See Exhibit C attached to this complaint.

25.     The application indicated that certain security measures, including a fence, game cameras, a gate with a chained lock, and signage indicating to the public that the site had an industrial research crop containing no THC would be installed at the site.  However, no such security devices and signage have been installed on the property on which the cannabis hemp seed has been planted and grown.

26.     As part of that application, Mallory attached Attachment C which included a "Hemp Research Project Description."  In that project description, he stated that the Research

Question was "What are the rates of nutrient and water application for industrial hemp to achieve maximum growth potential?"  See Exhibit D attached to this complaint.  The project description included a list of objectives and a work plan.

27.      In the timeline section of that plan, Mallory indicated that seeds for their project would be purchased through the West Virginia Department of Agriculture (hereinafter "WVDA").  See Exhibit D attached to this Complaint.

28.      Under the pilot program of the WVDA, growers are required to identify international sources for their cannabis seeds        for industrial hemp and submit that information to WVDA for approval.  They are not permitted to purchase cannabis seeds for industrial hemp from sellers in other states and have that seed transported across state lines.  If the international source for the industrial hemp seed for the project is approved, then the WVDA arranges for an appropriate import permit through its DEA registration and arranges for the importation of the industrial hemp seed.  After the DEA has approved the import permit, then the WVDA arranges for the industrial hemp seed to be shipped to its Guthrie Office for eventual transport to the licensed applicant.  An employee of the WVDA is present and transfers the imported industrial hemp seed to the licensed applicant at the delivery site.  See Exhibit F attached to this Complaint.

29.      Mallory and CAMO failed to follow this requirement of the WVDA pilot program that is also against the CSA legal requirement that cannabis seeds and plants not be transported across state lines.  Mallory and CAMO purchased cannabis hemp seed from Hickman Seed & Grain Company located in Clinton, Kentucky, on April 24, 2018, two days prior to the Application for Research and Marketing Cultivation of Industrial Hemp.  The cannabis hemp seed was shipped directly from Clinton, Kentucky to the property described in Mallory &

CAMO's application by United Parcel Service.  According to the shipping documents, approximately 5,000 pounds of cannabis hemp seed was picked up from Hickman Seed & Grain Company in Clinton, Kentucky, on April 24, 2018, and delivered to Grassy Run Farms, in Mason County, West Virginia, on April 25, 2018.  The delivery occurred one day prior to the date that Mallory signed the Application for Research and Marketing Cultivation of Industrial Hemp.  See Exhibits B and E attached to this complaint.

30.     The United States has also learned that Mallory and CAMO intend to harvest the hemp plants on the Mason County, West Virginia, property and ship the top portions of those plants, which include the seeds, to Pennsylvania.  The shipment of any part of a cannabis plant, including the seeds of a cannabis plant, across state lines is a violation of the CSA.

31.     The United States anticipates that Mallory and CAMO, in concert with Kale and Grassy Run Farms, will harvest this industrial hemp imminently.  Originally, Mallory and CAMO anticipated harvesting the hemp plants on September 1, 2018.  That harvest date has apparently been delayed, but based on information and belief, Mallory and CAMO, in concert with Kale and Grassy Run Farms, intend to start harvesting the hemp plants very soon.

32.     Unless Mallory, CAMO, Kale, Grassy Run Farms, and others who may be working in concert with them or who may be employed by them are enjoined from harvesting the hemp plants from that property, then the seeds and portions of those hemp plants may be transported across state lines in violation of the CSA and other federal laws.  Time is of the essence to prevent that action from occurring.

33.     Under the CSA, 21 U.S.C. § 841(a)(1) makes it unlawful, except as authorized by the CSA, for any person to knowingly or intentionally "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance...."

34.     Under 21 U.S.C. § 802(15), the CSA defines the term "manufacture" as "the production, preparation, propagation, compounding, or processing of a drug or other substance…." The CSA further defines "production" as "the manufacturing, planting, cultivation, growing, or harvesting of a controlled substance." 21 U.S.C. § 802(22).

35.     The CSA also makes it unlawful, except as authorized under the CSA, to "knowingly open or maintain any place for the purpose of manufacturing, distributing, or using any controlled substance." 21 U.S.C. § 856(a)(1).

36.     The CSA also makes it unlawful for any person to conspire to violate the CSA. 21 U.S.C. § 846.

37.     Since Mallory and CAMO have not complied with the conditions imposed upon them by the WVDA pilot program, they have purchased and transported cannabis seed across state lines in violation of the CSA to grow allegedly industrial hemp located on the property in Mason County, West Virginia, and, acting in concert with Kale and Grassy Run Farms, are attempting to harvest and transport parts of those cannabis plants across state lines (including cannabis seeds), that industrial hemp is no longer within the exemption permitted by 7 U.S.C. § 5940, and Mallory, CAMO, Kale, and Grassy Run Farms are, therefore, in violation of the CSA, 21 U.S.C. § 841(a)(1) prohibitions against the possession, manufacture, distribution, and possession with the intent to distribute marijuana, a Schedule I controlled substance.

38.     The CSA provides that federal district courts have jurisdiction in civil actions brought by the United States to enjoin violations of the CSA. 21 U.S.C. § 882(a).

## VII.  CLAIMS ASSERTED BY THE UNITED STATES AGAINST THE DEFENDANTS

39.     The defendants have engaged in the manufacturing, planting cultivation, and distribution of marijuana in violation of the CSA and other federal laws.

40.     The defendants, in concert with others, have engaged in the manufacture of marijuana in violation of the CSA and other federal laws.

41.     The defendants, in concert with others, have been engaged in the manufacture of, distribution of, and possession with intent to distribute marijuana in violation of the CSA and other federal laws.

42.     The defendants have maintained and utilized certain land in Mason, County, West Virginia, for the purpose of manufacturing, distributing, and possessing marijuana in violation of the CSA and other federal laws.

43.     The defendants have conspired, among themselves and with unknown individuals, to violate the CSA.

## COUNT I

44.     The United States hereby incorporates by reference paragraphs 1-43 as though fully set forth herein.

45.     The defendants have violated 21 U.S.C. § 841(a)(1) in concert with others by engaging in the possession, manufacturing, distribution, and possession with the intent to distribute marijuana, a Schedule I controlled substance.

46.     Defendants' actions, in concert with others, to manufacture, distribute, and possess with the intent to distribute marijuana are ongoing and continuing, and, based on information and belief, are likely to continue unless enjoined by the court.

## COUNT II

47.     The United States hereby incorporates by reference paragraphs 1-46 as though fully set forth herein.

48.     Under 21 U.S.C. § 856 it is unlawful to (1) knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance; and/or (2) manage or control any place, whether permanently or temporarily, either as owner, lessee, agent, employee, occupant, or mortgagee, and knowingly and intentionally rent, lease, profit from, or make available for the use, with or without compensation, the place for the purpose of unlawfully manufacturing, storing, distributing, or using  a controlled substance.

49.     The conduct of the defendants, and others acting in concert with them, violated 21 U.S.C. § 856 as the property on which the "industrial hemp" was grown was used for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance.

50.     Pursuant to 21 U.S.C. § 856(d), the United States is entitled to civil penalty from the defendants of not more than the greater of $250,000 or 2 times the gross receipts, either known or estimated, that were derived from each violation that is attributable to the person. Under 21 U.S.C. § 856(d)(2), the court may apportion the penalty between the defendants, but the defendants are jointly and severally liable for the civil penalty awarded pursuant to 21 U.S.C. § 856.

51.     The United States is also entitled to declaratory and injunctive relief for a violation of 21 U.S.C. § 856 pursuant to 21 U.S.C. § 856(e) and 21 U.S.C. § 843(f).

## COUNT III

52.     The United States hereby incorporates by reference paragraphs 1-51 as though fully set forth herein.

53.     In violation of 21 U.S.C. § 864, defendants, in concert with others, have conspired among themselves and with unknown individuals to violate the CSA.

54.     Defendants' actions, in concert with others, to conspire to violate the CSA are ongoing and continuing, and based, upon information and belief, are likely to continue unless enjoined by the court.

## COUNT IV

55.     The United States hereby incorporates by reference paragraphs 1-54 as though fully set forth herein.

56.     The marijuana plants, real property on which the plants have been grown, all equipment used to produce and manufacture those plants, all marijuana seeds and other marijuana plant components related thereto, are subject to seizure and forfeiture under 18 U.S.C. §§ 981, 985 and 21 U.S.C. § 881 and should be declared forfeited to the United States and all title and right to control those items and materials should be immediately vested in the United States.

57.     Defendants, together with their employees, servants, agents, and all others acting in concert with the defendants and those acting directly or indirectly on the defendants' behalf, should be barred and prohibited from destroying, altering, hiding, or spoiling all evidence, records, computer and digital information, and documents related to the marijuana plants, real property on which the plants have been grown, all equipment used to produce and manufacture those plants, and all marijuana seeds and other marijuana plant components related thereto which are the subject of this action.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff United States of America prays that this Court enter judgment against the defendants, and grant other and further relief, including, but not limited to, the following:

1.      Declare that defendants, together with their employees, servants, agents, and all others acting in concert with the defendants and those acting directly or indirectly on the defendants' behalf, are in violation of 21 U.S.C. § 841(a)(1) and other federal law by engaging in the possession, manufacture, and distribution of marijuana and possession with the intent to distribute marijuana, a Schedule I controlled substance.

2.      Declare that defendants, together with their employees, servants, agents, and all others acting in concert with the defendants and those acting directly or indirectly on the defendants' behalf, are in violation of 21 U.S.C. § 856(a)(1) and other federal law by opening, maintaining, using, renting, leasing, managing, controlling, and/or utilizing the land and/or facilities described herein for the purpose of manufacturing, storing, possessing, distributing, or using a controlled substance.  The United States also requests that the court award all penalties and damages to which it is entitled under 21 U.S.C. § 856(d).

3.      Declare that defendants, together with their employees, servants, agents, and all others acting in concert with the defendants and those acting directly or indirectly on the defendants' behalf, are in violation of 21 U.S.C. § 846 and other federal law by conspiring among themselves and with unknown individuals to violate the CSA.

4.      Enter a temporary restraining order, preliminary injunction, and permanent injunction enjoining the defendants, together with their employees, servants, agents, and all others acting in concert with the defendants and those acting directly or indirectly on the defendants' behalf, from hereafter manufacturing, manufacturing with intent to distribute or distributing marijuana, a Schedule I controlled substance, or possessing marijuana with the intent to manufacture or distribute the substance in violation of 21 U.S.C. § 841(a)(1).

5.     Enter a temporary restraining order, preliminary injunction, and permanent injunction enjoining the defendants, together with their employees, servants, agents, and all others acting in concert with the defendants and those acting directly or indirectly on the defendants' behalf, from hereafter opening,  maintaining, using, renting, leasing, managing, controlling, and/or utilizing land and/or facilities for the purpose of manufacturing, storing, possessing, distributing, or using marijuana or any controlled substance in violation of 21 U.S.C. § 856.

6.     Enter a temporary restraining order, preliminary injunction, and permanent injunction enjoining the defendants, together with their employees, servants, agents, and all others acting in concert with the defendants and those acting directly or indirectly on the defendants' behalf, from hereafter conspiring to violate the CSA.

7.     Enter a temporary restraining order, preliminary injunction, and permanent injunction enjoining the defendants, together with their employees, servants, agents, and all others acting in concert with the defendants and those acting directly or indirectly on the defendants' behalf, from harvesting, destroying, or altering in any way the marijuana plants or the property described herein located in Mason County, West Virginia.

8.     Enter a temporary restraining order, preliminary injunction, and permanent injunction enjoining the defendants, together with their employees, servants, agents, and all others acting in concert with the defendants and those acting directly or indirectly on the defendants' behalf, barring and prohibiting them from destroying, altering, hiding, or spoiling any and all evidence, records, computer and digital information, and documents related to the marijuana plants, real property on which the plants have been grown, all equipment used to

17

produce and manufacture those plants, and all marijuana seeds and other marijuana plant components related thereto which are the subject of this action.

      9.    All other relief as the Court may deem just and equitable.

Dated:  This September 11, 2018.

Respectfully submitted,

**MICHAEL B. STUART**
**United States Attorney**


**s/Fred B. Westfall, Jr.**
WV State Bar No. 3992
Assistant United States Attorney
Attorney for United States
P.O. Box 1713
Charleston, WV  25326
Phone: 304-345-2200
Fax: 304-347-5443
E-mail: fred.westfall@usdoj.gov

# EXHIBIT A



# Notices

Federal Register

Vol. 81, No. 156

Friday, August 12, 2016

This section of the FEDERAL REGISTER contains documents other than rules or proposed rules that are applicable to the public. Notices of hearings and investigations, committee meetings, agency decisions and rulings, delegations of authority, filing of petitions and applications and agency statements of organization and functions are examples of documents appearing in this section.

## DEPARTMENT OF AGRICULTURE

### Office of the Secretary

## DEPARTMENT OF JUSTICE

### Drug Enforcement Administration

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Food and Drug Administration

### Statement of Principles on Industrial Hemp

**AGENCY:** Office of the Secretary, USDA; Drug Enforcement Administration, DOJ; Food and Drug Administration, HHS.

**ACTION:** Notice

**SUMMARY:** The U.S. Department of Agriculture, in consultation with the U.S. Drug Enforcement Administration and the U.S. Food and Drug Administration, has developed a *Statement of Principles on Industrial Hemp* to inform the public how Federal law applies to activities associated with industrial hemp that is grown and cultivated in accordance with Section 7606 of the Agricultural Act of 2014. The purpose of this notice is to set forth the statement in its entirety.

**DATES:** This Statement of Principles is applicable August 12, 2016.

**FOR FURTHER INFORMATION CONTACT:** Michael Poe, Telephone Number: (202) 720–3257.

**SUPPLEMENTARY INFORMATION:**

### 1. Statement of Principles

With publication of this notice, the U.S. Department of Agriculture (USDA) issues, with the concurrence of the U.S. Drug Enforcement Administration (DEA) and the U.S. Food and Drug Administration (FDA), the following Statement of Principles regarding the applicability of Federal laws to activities associated with growing and cultivating industrial hemp:

Section 7606 of the Agricultural Act of 2014 legalized the growing and cultivating of industrial hemp for research purposes in States where such growth and cultivation is legal under State law, notwithstanding existing Federal statutes that would otherwise criminalize such conduct. The statutorily sanctioned conduct, however, was limited to growth and cultivation by an institution of higher education or State department of agriculture for purposes of agricultural or other academic research or under the auspices of a State agricultural pilot program for the growth, cultivation, or marketing of industrial hemp.

Section 7606 authorized State departments of agriculture to promulgate regulations to carry out these pilot programs but did not provide a specific delegation to the U.S. Department of Agriculture (USDA) or any other agency to implement the program. As well, the statute left open many questions regarding the continuing application of Federal drug control statutes to the growth, cultivation, manufacture, and distribution of industrial hemp products, as well as the extent to which growth by private parties and sale of industrial hemp products are permissible. Section 7606 did not remove industrial hemp from the controlled substances list. Therefore, Federal law continues to restrict hemp-related activities, to the extent that those activities have not been legalized under section 7606.

USDA, having consulted with and received concurrence from the U.S. Drug Enforcement Administration (DEA) and the U.S. Food and Drug Administration (FDA), therefore, is issuing this statement of principles to inform the public regarding how Federal law applies to activities involving industrial hemp so that individuals, institutions, and States that wish to participate in industrial hemp agricultural pilot programs can do so in accordance with Federal law.

• The growth and cultivation of industrial hemp may only take place in accordance with an agricultural pilot program to study the growth, cultivation, or marketing of industrial hemp established by a State department of agriculture or State agency responsible for agriculture in a State

where the production of industrial hemp is otherwise legal under State law.

• The State agricultural pilot program must provide for State registration and certification of sites used for growing or cultivating industrial hemp. Although registration and certification is not further defined, it is recommended that such registration should include the name of the authorized manufacturer, the period of licensure or other time period during which such person is authorized by the State to manufacture industrial hemp, and the location, including Global Positioning System coordinates, where such person is authorized to manufacture industrial hemp.

• Only State departments of agriculture, and persons licensed, registered, or otherwise authorized by them to conduct research under an agricultural pilot program in accordance with section 7606, and institutions of higher education (as defined in section 101 of the Higher Education Act of 1965 (20 U.S.C. 1001)), or persons employed by or under a production contract or lease with them to conduct such research, may grow or cultivate industrial hemp as part of the agricultural pilot program.

• The term "industrial hemp" includes the plant *Cannabis sativa* L. and any part or derivative of such plant, including seeds of such plant, whether growing or not, that is used exclusively for industrial purposes (fiber and seed) with a tetrahydrocannabinols concentration of not more than 0.3 percent on a dry weight basis. The term "tetrahydrocannabinols" includes all isomers, acids, salts, and salts of isomers of tetrahydrocannabinols.

• For purposes of marketing research by institutions of higher education or State departments of agriculture (including distribution of marketing materials), but not for the purpose of general commercial activity, industrial hemp products may be sold in a State with an agricultural pilot program or among States with agricultural pilot programs but may not be sold in States where such sale is prohibited. Industrial hemp plants and seeds may not be transported across State lines.

• Section 7606 specifically authorized certain entities to "grow or cultivate" industrial hemp but did not eliminate the requirement under the Controlled Substances Import and

Export Act that the importation of viable cannabis seeds must be carried out by persons registered with the DEA to do so. In addition, any USDA phytosanitary requirements that normally would apply to the importation of plant material will apply to the importation of industrial hemp seed.

• Section 7606 did not amend the Federal Food, Drug, and Cosmetic Act. For example, section 7606 did not alter the approval process for new drug applications, the requirements for the conduct of clinical or nonclinical research, the oversight of marketing claims, or any other authorities of the FDA as they are set forth in that Act.

• The Federal Government does not construe section 7606 to alter the requirements of the Controlled Substances Act (CSA) that apply to the manufacture, distribution, and dispensing of drug products containing controlled substances. Manufacturers, distributors, dispensers of drug products derived from cannabis plants, as well as those conducting research with such drug products, must continue to adhere to the CSA requirements.

• Institutions of higher education and other participants authorized to carry out agricultural pilot programs under section 7606 may be able to participate in USDA research or other programs to the extent otherwise eligible for participation in those programs.

## 2. Regulatory Requirements

This Statement of Principles does not establish any binding legal requirements. It is, therefore, exempt from notice and comment rulemaking requirements under the Administrative Procedure Act pursuant to 5 U.S.C. 553(b). Because no notice of proposed rulemaking is required, the Regulatory Flexibility Act does not require an initial or final regulatory flexibility analysis. 5 U.S.C. 603(a), 604(a). USDA has determined that this Statement of Principles does not impose any new or revise any existing recordkeeping, reporting, or disclosure requirements on covered entities or members of the public that would be collections of information requiring OMB approval under the Paperwork Reduction Act, 44 U.S.C. 3501, et seq.

Dated: July 25, 2016.
**Thomas J. Vilsack,**
*Secretary of Agriculture.*

Dated: July 21, 2016.
**Louis J. Milione,**
*Deputy Assistant Administrator, Drug Enforcement Administration.*

Dated: July 22, 2016.
**Leslie Kux,**
*Associate Commissioner for Policy, Food and Drug Administration.*
[FR Doc. 2016–19146 Filed 8–11–16; 8:45 am]
**BILLING CODE 3410–01–P**

## DEPARTMENT OF AGRICULTURE

### Animal and Plant Health Inspection Service

**[Docket No. APHIS–2016–0043]**

### Okanagan Specialty Fruits, Inc.; Availability of Preliminary Finding of No Significant Impact, Preliminary Plant Pest Risk Similarity Assessment, and Preliminary Determination for an Extension of a Determination of Nonregulated Status for Non-Browning Arctic® Apple Event NF872 Apple

**AGENCY:** Animal and Plant Health Inspection Service, USDA.

**ACTION:** Notice.

**SUMMARY:** We are advising the public that the Animal and Plant Health Inspection Service has reached a preliminary decision to extend our determination of nonregulated status of Okanagan Specialty Fruits' (OSF) GS784 and GD743 apples to OSF NF872 'Arctic® Fuji apple'. OSF's NF872 apple has been genetically engineered for enzymatic browning resistance using the same mode of action as GS784 and GD743 apples. We are making available for public comment our preliminary determination, preliminary plant pest risk similarity assessment, and preliminary finding of no significant impact for the proposed determination of nonregulated status.

**DATES:** We will consider all comments that we receive on or before September 12, 2016.

**ADDRESSES:** You may submit comments by either of the following methods:

• *Federal eRulemaking Portal:* Go to *http://www.regulations.gov/ #!docketDetail;D=APHIS-2016-0043.*

• *Postal Mail/Commercial Delivery:* Send your comment to Docket No. APHIS–2016–0043, Regulatory Analysis and Development, PPD, APHIS, Station 3A–03.8, 4700 River Road Unit 118, Riverdale, MD 20737–1238.

The Okanagan Specialty Fruits extension request, our preliminary determination, preliminary plant pest risk similarity assessment, preliminary finding of no significant impact, and any comments we receive on this docket may be viewed at *http:// www.regulations.gov/ #!docketDetail;D=APHIS-2016-0043* or in our reading room, which is located in room 1141 of the USDA South Building, 14th Street and Independence Avenue SW., Washington, DC. Normal reading room hours are 8 a.m. to 4:30 p.m., Monday through Friday, except holidays. To be sure someone is there to help you, please call (202) 799–7039 before coming.

Supporting documents and any comments we received regarding our determination of nonregulated status of the antecedent organisms (apple events GD743 and GS784), can be found at *http://www.regulations.gov/ #!docketDetail;D=APHIS-2012-0025.* Supporting documents may also be found on the APHIS Web site for NF872 'Arctic® Fuji apple' (the organism under evaluation) under APHIS Petition Number 16–004–01p, and the antecedent organisms (apple events GD743 and GS784) under APHIS Petition Number 10–161–01p.

**FOR FURTHER INFORMATION CONTACT:** Dr. John Turner, Director, Biotechnology Risk Analysis Programs, Biotechnology Regulatory Services, APHIS, 4700 River Road Unit 147, Riverdale, MD 20737–1236; (301) 851–3954, email: *john.t.turner@aphis.usda.gov.* To obtain copies of the supporting documents, contact Ms. Cindy Eck at (301) 851–3885, email: *cynthia.a.eck@ aphis.usda.gov.*

**SUPPLEMENTARY INFORMATION:** Under the authority of the plant pest provisions of the Plant Protection Act (PPA) (7 U.S.C. 7701 et seq.), the regulations in 7 CFR part 340, "Introduction of Organisms and Products Altered or Produced Through Genetic Engineering Which Are Plant Pests or Which There Is Reason to Believe Are Plant Pests," regulate, among other things, the introduction (importation, interstate movement, or release into the environment) of organisms and products altered or produced through genetic engineering that are plant pests or that there is reason to believe are plant pests. Such genetically engineered organisms and products are considered "regulated articles."

The regulations in § 340.6(a) provide that any person may submit a petition to the Animal and Plant Health Inspection Service (APHIS) seeking a determination that an article should not be regulated under 7 CFR part 340. Further, the regulations in § 340.6(e)(2) provide that a person may request that APHIS extend a determination of nonregulated status to other organisms. Such a request must include information to establish the similarity of the antecedent organism and the regulated article in question.

# EXHIBIT B



**WEST VIRGINIA DEPARTMENT OF AGRICULTURE**
**PLANT INDUSTRIES DIVISION**
**PLANT PEST REGULATORY PROGRAM**
**1900 KANAWHA BOULEVARD, EAST**
**CHARLESTON, WV 25305-0191**
**(304) 558-2212**

Walt Helmick
Commissioner

## Application for Research and Marketing Cultivation of Industrial Hemp

The West Virginia Industrial Hemp Development Act (Chapter 19, Article 12 of the Code of West Virginia, as amended) governs the production and distribution of plant material commonly known as Industrial Hemp. Under the provisions of the Industrial Hemp Development Act, plants specifically identified as *Cannabis sativa* L. containing no more than 1% tetrahydrocannabinol, or the current limit allowed by federal law (whichever is more restrictive), and are used solely for the purposes authorized by the Act, are regulated by the West Virginia Department of Agriculture (WVDA). It is unlawful for anyone to produce or distribute plants or parts of plants commonly known as industrial hemp unless that person has first secured a certificate of registration from the Commissioner of Agriculture.

### SECTION 1:

**Business Name:** CAMO HEMP WV LLC.          **Proprietor:** Matthew Mallory

**Proprietor Date of Birth:** _____          **Proprietor SSN:** _____

**Mailing Address:** _____

**City:** Pittsburgh          **State:** Pennsylvania          **Zip Code:** 15243

**Email Address:** Matthew@camomedical.com

**Phone:** _____          **Cell Phone:** _____

Do you have cooperators besides the WVDA who you expect to participate in this project? ⊗ Yes ○ No
If Yes, please list the cooperator(s) and provide copies of any contracts or other agreements related to your project:

West Virginia Farmers Cooperative, Morgan Leach Esq.

### SECTION 2: DESCRIPTION OF PRODUCTION SITE

**County of Production:** Brooke County, Mason County          **District:** Senate District 1  & Senate District 4

**GPS Coordinates of Production Site:** See Attachment A-1

**Parcel(s):** NA          **Map(s):** Attachment "A2,A3,A4,A5          **Total Acreage in Production:** 190

Do you have security measures at the production site? ⊗ Yes ○ No
If yes, please describe these measures including signage, fencing, etc.:

Some grow sites have a fence and a gate. Game cameras will be intalled. The gate will be chained with a lock. We will place signage (Attachment "B") that informs the public to that this is a industrial research crop containing no 'THC"

**SECTION 3: DESCRIPTION OF RESEARCH PROJECT** (Include your plans for <u>site selection, planting, maintenance,</u> <u>harvesting and post-harvest utilization of industrial hemp</u>. Also include your proposed <u>seed source</u> and if you have confirmed <u>availability of seed</u>.  Please attach additional pages if needed.)

<b>See Attachment "C"</b>

**SECTION 4:**

By signing below the applicant acknowledges that industrial hemp is a Schedule 1, Federally Controlled Substance and agrees to the following terms and conditions:

A. Any information provided to the Department, except criminal history records provided to the Department under this section, may be publicly disclosed and be provided to law enforcement agencies without further notice to the applicant;

B. The applicant agrees to allow any inspection and sampling that the Department considers necessary;

C. The applicant agrees to pay for any sampling and analysis costs that the Department considers necessary; and

D. The applicant agrees to submit all required reports by the applicable due-dates specified by the Commissioner.

Date: _4-26-2018_ Signature: _____ Title: _CEO_

*Registration Fee: $100 plus $5.00 per acre in production: <u>**$1,050.00 for 190 acres**</u>
*Make check or money order payable to **West Virginia Department of Agriculture** and return with this application.

Mail to:
WV Department of Agriculture
Plant Industries Division
c/o Eric Ewing
1900 Kanawha Blvd., East
Charleston, WV 25305

If you have any questions or need assistance please call (304) 558-2212 or email eewing@wvda.us

Attachment B







# EXHIBIT C



# Research and Marketing Cultivation of Industrial Hemp License

**Kent A. Leonhardt**
Commissioner

**Matthew Mallory**
**CAMO HEMP WV, LLC**
**470 Longridge Drive**
**Pittsburgh, PA 15243**

Has paid application fees in accordance with the requirements of Chapter 19, Article 12E, Section 7, of the State Code of West Virginia.

This certifies that Matthew Mallory (CAMO HEMP WV, LLC) has met all requirements to obtain this license and may possess, cultivate, grow, harvest, produce, sell, distribute or deliver industrial hemp within West Virginia provided the provisions of the Industrial Hemp Rule and the regulations of the Commissioner are fully met.

This license may be revoked for cause.

| Date Issued: | Expires on December 31, | Certificate Number: |
|---|---|---|
| 3/21/2018 | 2018 | 0040 |

*K.A. Leonhardt*

**Commissioner of Agriculture**
**West Virginia Department of Agriculture**
**Plant Industries Division**
**Plant Regulatory Programs**
**1900 Kanawha Boulevard, East**
**Charleston, WV 25305-0191**

This Original Certificate contains a Watermark of the State of West Virginia Department of Agriculture Seal. Hold up to the light to verify. The Watermark is visible from both sides of the sheet.

# EXHIBIT D



**ATTACHMENT – C**
**QUESTION 3: HEMP RESEARCH PROJECT DESCRIPTION**

**Project Title:**
Industrial Hemp Soil Supply & Nutritional Demand

**Research Question:**
What are the rates of nutrient and water application for industrial hemp to achieve maximum growth potential?

**Project Abstract:**
This project will be focused on determining the soil supply and nutritional demand requirements of industrial hemp for fiber and seed. Plant nutrient content represents the effects of not only soil nutrient status, but also all the factors of plant growth. A single year's information may not be useful for planning a soil fertility management program. However, as results are accumulated over a period of years, the information will become more valuable.

All expenses will be recorded and evaluated for each phase of the research project and summarized in a final report. The resulting plant nutritional data will enable large scale projects to reach ideal feeding schedules reducing future investment cost. Tests and observations for characteristics such as diameter of fiber, height of the plant, density of seeds, etc. will be recorded and evaluated for each of the three hemp cultivars. In conclusion, the data resulting from these observations will be compiled into a summary and set of recommendations about the three hemp cultivars' nutritional needs.

**Objectives**
1) Analysis to determine the nutritional demand of industrial hemp in soils.
2) Determine plant nutrient status, identifying nutrient deficiency.
3) Determine the nitrogen uptake by hemp, by identifying the point at which hemp quality and yields no longer significantly rise with additional nitrogen (Nitrogen applications are tracked, release rates are estimated and adjusted for expected losses, and the calculated total is compared to the expected daily crop need for nitrogen).
4) Determine the change in levels of Macro and Micro nutrients, watering needs, as well as alkalinity(pH) from before and after each successive crop.
5) Determine the total biomass per acre.
6) Publish and otherwise disseminate the results of the research projects developed through CAMO. (Publication of the results from the research projects will be accomplished in a way that protects proprietary information and potentially patentable intellectual property).

**Work plan**
Machinery requirements – These requirements include a disk harrow, seed drill, combine, 4x5 round baler, screen/winnowing cleaner.
Upon approval of this project - Initial recording of the current conditions of the site will be taken. Framing of the site consists of a control area and incremental areas with increasing nutrient densities and watering rates.
Preparation of soil - Minimal tillage with a disk harrow, row crop in furrows and seed drilled into the ridges.
Planting - Drill seeds before any weed development, after disking/harrowing, to keep the hemp plant growing to shade out any weeds.
Harvest and threshing - Starts with combining the tops and then a side bar to cut the fiber. The fiber will be left to rhet in the field and turned once in rows. When ready it will be baled.
Seed Cleaning and Storage - All seed will be cleaned and measured.
Data Collection - The plants' development will be tracked via the recording of the growth stages of hemp utilizing the decimal coding system (Cannabis sativa L.) by Mediavilla et al. (1998) For example, #2205 is a female plant at the end of seed maturity where 95% of seeds are hard or have shattered. All data collection will be done by the research director, including the frequency of use of nutrients, herbicide, weather data, and pesticide applications, etc.
Procedures for the end of this project - Most of the litter (leaf) material will have fallen off and started to compost back in the field right around harvest. The fiber/stalks will be rhetted in the field and baled when the moisture is 15% - 18%. The bales will be stored at the storage location for future research use.



The seeds will be cleaned and stored in a cool dry secure location.  All remaining material, leaf and flower, will be removed and composted into soil to destroy it.

**Timeline**
l

| Activity | Conducted by | Timeframe |
|---|---|---|
| Name of soil series, textural class and taxonomic classification. | Researcher | February-March |
| Order seeds (through the WVDA) | WVDA / Researcher | January 1st |
| Soil chemical analyses and physical properties of the site. | Researcher | March 15th – April 15th |
| Tillage, preparing field and soil | Farmer | March 15th – April 15th |
| Pre-emergence herbicide applications | Farmer | March 15th – April 15th |
| Gridding off research blocks. | Researcher | March 15th – April 15th |
| Drilling of seeds, date, rate, etc. | Farmer | May 7th - October 1st, 2018 (147 totaling  days) |
| Daily farming and maintenance | Farmer | As needed |
| Recording of data via digital coding | Researcher | Daily, every 3 days minimum |
| Nutrients | Farmer | As needed |
| General pesticide | Farmer | As needed |
| Type, schedule and amount of irrigation | Farmer | As scheduled per test grid |
| Harvest of seed tops, followed by the fiber stalks. | Farmer | September 1st, 2017 (totaling 150 days) approximately $\approx$ 100 days needed for cultivar maturation |
| Removal of leaves; cleaning of seed, rhetting of stalks in the field | Farmer | October 2nd - October 14th, 2018 |
| Baling of stalks in the field | Farmer | October 15th, 2018 |
| Soil samples (after harvest) | Researcher | October 15th, 2018 |
| Mulch remaining material into field | Farmer | November |

**Security Considerations**
Site is surrounded by fence. access through gate with a lock. Signage will be located at key visible locations/ entry points around the site. Two sides of the project South and West, are at the boundary of a heavily wooded forest area. Camo will install game cameras. Education is critical. In case of any vandalism, a public awareness information campaign can be implemented to inform the local community of the research project and its intent to dissuade future disturbances.

**Method of measuring project success:**



1) Soil testing and summarizing the results of the control and variations of test plots.
2) Using a decimal code for the growth stages of hemp to track development and stages of growth over time. This enables tracking of the health and growth rate of the plants over time. Using the data and plotting out corresponding graphs, the data will reveal the beneficial nutrient and water rations for the specific cultivar grown.
3) Nutrient Monitoring Sample collection: the nutrient concentration in a plant varies with the plant's age and the part of the plant sampled. The appropriate plant part must be collected for the age of the plant, and several plants must be included to obtain a representative sample. Specific directions on plant sampling generally are available from the plant analysis laboratory.
4) Diagnosing Nutrient Issues Plant tissue analyses are useful in diagnosing crop nutritional issues. Samples will be taken from the test areas and the control area for comparison. Identify the symptoms on the plants, note any patterns in the field, and consider the timing of when the problem presented itself.
5) Soil testing and plant analysis can confirm one another, when the cause of the problem is something other than a nutrient deficiency in the soil.

Things to consider include tillage, pesticide use, pests, differences in cultivars, and soil conditions such as compaction and moisture. The more data collected in this project, the more specific the three cultivars nutrient and water needs are identified for each cultivar. Scaling up into a bigger project will be easier knowing the needs of the specific cultivars of industrial hemp.

**Plant material handling at end of project: testing and transport**

i.   Anticipated hemp plant material, seed, or hemp products retained:

     Yes, plant materiel (bales), Stalks and seed will be destroyed.

ii.  Methods for destruction of any hemp plant material remaining at the end of the research project:

     Any Cannabis plant material left over at the end of the project will be disked back into the soil. At the end of the last season of the project, the following year may produce volunteer plants which can be disked/ plowed back into the soil. During the project, every week, the farmers will survey the perimeter of the site to remove any volunteer plants outside the designated site boundary.

# EXHIBIT E

**DELIVERY RECEIPT**

| CONSIGNEE | | DELIVERING TRAILER | SHIPPER | 393 617 394 |
|---|---|---|---|---|

GRASSY RUN FARMS — HICKMAN SEED & GRAIN

3385 ST RT 1826

1541 KANAWHA VALLEY ROAD
HENDERSON          WV 25106
09287263

FREIGHT BILL NUMBER: **393 617 394**
CLINTON          KY 42031
00583505          (270)653-6310

PO# NONE

UPS FREIGHT PHONE NUMBER: (800)333-7400

| CITY RTE/AVD SCAC | DEST | ADV CAR |
|---|---|---|
| 025N | CHW | |

| PICK UP DATE | ORIG | BL# NONE |
|---|---|---|
| 04/24/18 | PDH | |

25    D/R COPY:    1

ADDITIONAL DELIVERY INFO:
NONE

UPS Freight™  [UPS]  www.upsfreight.com

304-312-70(ew)    4/25    393 617 394

*(handwritten)* turn on 817 from 35. look for LArge Cattle trailer. After delivery EAn take 817 back to 35.

| #PCS | HM | PT | DESCRIPTION OF ARTICLES AND SPECIAL MARKINGS | WEIGHT(LBS) | NMFC |
|---|---|---|---|---|---|
| | | | 4  PIECE(S) COUNTED AND VERIFIED ON | | |
| | | | 4 SK  HANDLING UNIT(S) WITH THE FOLLOWING: | | |
| 4 | | SK | HEMP SEED | 5285 | 000100-00 |
| | | | LTL FUEL ADJUSTMENT | | |
| | | | UPS WORLDSHIP | | |
| | | | RESIDENTIAL DELIVERY | | |
| | | | NONE          CONSIGNEE PHONE# | | |
| | | | 232.07  CUBIC FEET | | |
| | | | * * * * *  ATTENTION  * * * * * | | |
| | | | AARON | | |
| | | | ACTUAL DENSITY:    22.8 LBS/CUFT | | |
| | | | PAGE  1 OF  2 | | |

| CONTD | <TTL PCS | PRINT NAME | TTL WT> | ODOM | ARRIVE | DEPART |
|---|---|---|---|---|---|---|
| | | SIGNATURE  X | FIRM | | | |

PIECES DLVRD
WRAP  INTACT?
YES    NO?

RECEIVED THE ABOVE PROPERTY IN GOOD CONDITION EXCEPT AS NOTED
RECORD EXCEPTIONS & DESCRIPTIONS OF GOODS IN BODY OF FORM ABOVE

DATE          DRIVER NAME

*(handwritten)*
Attn! Mike Smith
3 pages

| CONSIGNEE | DELIVER RECEIPT | | DELIVERING TRAILER | SHIPPER | | 393 617 394 |

| | | FREIGHT BILL NUMBER | | |
| | | 393 617 394 | | |
| | | CITY RTE/BYD 3CAC | DEST | ADV CAR |

| PO# | UPS FREIGHT PHONE NUMBER | PICK UP DATE | ORIG | GLN |

**UPS Freight™** ups   www.upsfreight.com

| #PCS | HM | PT | DESCRIPTION OF ARTICLES AND SPECIAL MARKINGS | WEIGHT(LBS) | NMFC |
|------|----|----|----------------------------------------------|-------------|------|
| | | | #HU TYPE LENGTH WIDTH  HEIGHT | | |
| | | | 1 SCN  51.00  50.00  42.50 IN | | |
| | | | 1 SCN  50.00  49.50  45.50 IN | | |
| | | | 1 SCN  50.50  43.50  43.50 IN | | |
| | | | 1 SCN  51.50  48.50  40.50 IN | | |
| | | | TOTAL CUBIC FEET:    232.071 | | |
| | | | BILL TO: 02312227 | | |
| | | | HICKMAN SEED & GRAIN | | |
| | | | UPGF  6180 0449595 | | |
| | | | UPGF 560    03/26/18 C N  03059 | | |
| | | | PAGE  2 OF  2 | | |

| 4   TTL PCS | PRINT NAME  Karon Glascock | TTL WT >  | 5285 | ROOM 797 | ARRIVE 3:15 | DEPART 3.3 |
| PIECES WRAPD  4562 | SIGNATURE | FRM  Grassy Run Farm | | DATE 3/25/18 | DRIVER NAME  Thompson |
| WRAP  YES  NO? | RECEIVED THE ABOVE PROPERTY IN GOOD CONDITION EXCEPT AS NOTED | | | | |
| | RECORD EXCEPTIONS & DESCRIPTIONS OF GOODS IN BODY OF FORM ABOVE | | | | |

UPS WorldShip 21.0.19
STRAIGHT BILL OF LADING- SHIPPING ORDER NOT NEGOTIABLE
UPS FREIGHT (UPGF)

WEB SITE: www.ups.com
DATE: 04/24/2018

Page 1 of 1

| CONSIGNEE | SHIPPER | BILL TO |
|---|---|---|
| GRASSY RUN FARMS | HICKMAN SEED & GRAIN COMPANY | HICKMAN SEED & GRAIN COMPANY |
| ATTENTION: AARON | ATTENTION: J.T. WORKMAN IV | ATTENTION: J.T. WORKMAN IV |
| UPS Freight cannot deliver to a P.O. Box | | |
| 11541 KANAWHA VALLEY ROAD | 3385 STATE ROUTE 1826 | 3385 STATE ROUTE 1826 |
| HENDERSON, WV 25106 | CLINTON, KY 42031 | CLINTON, KY 42031 |
| US | US | US |
| | PHONE: 2708536310 | PHONE: 2708536310 |

☐ LTL GUARANTEED A.M. SERVICE REQUESTED (if box is checked)
By checking this box, you request UPS Freight to deliver this shipment before 12 PM on the standard day of service and agree to pay all fees associated with this service.

☐ LTL GUARANTEED SERVICE REQUESTED (if box is checked)
By checking this box, you request UPS Freight to deliver this shipment on the standard day of service and agree to pay all fees associated with this service.

DESCRIPTION OF ARTICLES, WEIGHT, NMFC, & CLASS ARE SUBJECT TO CORRECTION

| # OF PCS. | PKG TYPE | HM | DESCRIPTION OF ARTICLES & SPECIAL MARKS | WEIGHT (lbs) | NMFC | CLASS |
|---|---|---|---|---|---|---|
| 4 | Pallet | | Hemp Seed | 5285 | | 100 |
| 4 | | | | | TOTALS: 5285 | |

SHIPPED AS: 4 PALLET(S) AND 0 LOOSE

"Marked with an "X" to designate Hazardous Materials as defined in Title 48 of the Code of Federal Regulation.

| BILLING METHOD: | | | | |
|---|---|---|---|---|
| ☑ Prepaid | ☐ Collect | ☐ Third Party | Received $_____ to be delivered in the prepayment of the charges on the property described herein. (agent or cashier) | Hazmat Emergency Contact: |
| | | | | Hazmat Emergency Phone #: |
| | | | | Hazmat Contact #: |

Additional Services: (CHARGES MAY APPLY)

| ☐ CALL BEFORE DELIVERY | ☐ LIMITED ACCESS PICKUP | REFERENCE NUMBERS: |
|---|---|---|
| ☐ LIMITED ACCESS DELIVERY | ☐ HOLIDAY PICKUP | |
| ☐ HOLIDAY DELIVERY | ☐ INSIDE PICKUP | |
| ☑ RESIDENTIAL DELIVERY | ☐ RESIDENTIAL PICKUP | |
| ☐ WEEKEND DELIVERY | ☐ WEEKEND PICKUP | |
| ☐ LIFT GATE DELIVERY | ☐ LIFT GATE PICKUP | |
| ☐ INSIDE DELIVERY | ☐ FREEZABLE PROTECTION | |
| ☐ EXTREME LENGTH | ☐ SORT AND SEGREGATE | |
| | Pieces | |

| FEE COLLECT UNLESS OTHERWISE MARKED | IF NOT CHECKED, BOTH ARE ACCEPTABLE | REMIT COD CHECK TO: |
|---|---|---|
| COD FEE ☐ PREPAID ☐ COLLECT | ☐ CONSIGNEE CHECK ACCEPTABLE | |
| COD SHIPMENTS GOVERNED BY UPGF 102 RULES ITEM #430 | ☐ CERTIFIED CHECK | |
| COD AMT | | |

Special Instructions:

RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classification and rules that have been established by the carrier and are available to the shipper, on request, *** the property described above, in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined as shown above, which carrier agrees to carry to its destination, if on its route, or otherwise to deliver to another carrier on the route to destination. Every service to be performed hereunder shall be subject to all conditions not prohibited by law, whether printed or written, herein contained, including the Uniform Bill of Lading Terms and Conditions, in the UPGF, which are hereby incorporated herein by reference and agreed to by the shipper and accepted for itself and its assigns. Where a bill is prepaid or broker and/or carrier holds back the shipper and consignee holds for freight charges.

Subject to Section 7 Terms and Conditions, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement. UPS Freight may decline to make delivery of the shipment without payment of freight and all other lawful charges.

(Signature)_____

| ODOMETER | ARRIVE | DEPART | DESTINATION | TRAILER NUMBER | LINEAR FEET OF SHIPMENT |
|---|---|---|---|---|---|
| | | | | SEAL # APPLIED | |
| | | | | BEYOND BCAC: | GROSS REF PRO # |
| | | | | ☐ SHIPPER LOAD ☐ CONSIGNEE UNLOAD | |

PDH 393617394

Now available at www.upsfreight.com - UPGF 102 Series Rules Tariff - Electronic Bill of Lading

UPS Freight shall have no liability or responsibility whatsoever in connection with this bill of lading if the shipper did not tender the shipment to UPS Freight for shipment.

This is to certify that the above named materials are properly classified, described, packaged, marked, and labeled and are in proper condition for transportation according to the applicable regulations of the Department of Transportation.

Firm name: Hickman Seed & Grain Company

| Carrier: UPS Freight | Driver: |
|---|---|

Signed by:_____
01C-199 (Rev 04/08)

| Date Received: | UPS Freight Piece Count: |
|---|---|

# EXHIBIT F

# West Virginia Department of Agriculture



Kent A. Leonhardt, Commissioner
Joseph L. Hatton, Deputy Commissioner

**Review Process Review:**

Once the application period has ended WVDA personnel will evaluate each application and do one of the following:

1. Accept your application and issue a "**Provisional License**". (Pending receipt/review of your WV State Police and FBI Background Checks.)
2. Accept your application and issue a "**Full License**". (If both background checks are on file and already approved.)
3. Refuse your application and return your payment.

In each of the previous situations the WVDA will return a letter describing your status. (*Again, applications received outside of the application period will be returned without consideration.*)

**Background Check Process:**

Each approved applicant will be required to have fingerprints recorded. A WV State Police background check **and** an FBI Background Check must be completed and returned to this office for inclusion with each application package. The reports will be evaluated by the WVDA, considering past felony or DUI convictions. (Contact me for further details on what might cause a refusal based on a background check.) "**Full Licenses**" will not be issued to any applicant without both background checks on file and approved by the WVDA. (*The applicant is solely responsible for the entire background check process although the timing may vary. Some applicants may want to submit their reports with their application while others wait for application approval before investing the funds to have the background checks completed.*)

**Licensing:**

Generally, a "**Provisional License**" will be issued when the application has been approved and before the background checks are reviewed by the WVDA. This allows the applicant to contact seed suppliers before being fully approved to grow hemp in WV. This offers a buffer while the background checks are performed by their parent agencies. If the background checks are submitted with the application and they are approved, the WVDA may issue the "**Full License**" initially. It is imperative that all applicants be aware that without a "**Full License**" it is illegal to possess any form of cannabis plant material. Cannabis sativa in the hands of an individual not involved in a state administered Industrial Hemp Program is considered a controlled substance and subject to applicable laws.

mailing address: 1900 Kanawha Blvd. East, Charleston, WV 25305-0170

physical address: 217 Gus R. Douglass Lane, Charleston, WV 25312

telephone: 304-558-3550 • fax: 304-558-2203

## West Virginia Department of Agriculture



Kent A. Leonhardt, Commissioner
Joseph L. Hatton, Deputy Commissioner

**Obtaining Seed and Import Permits**:

The Drug Enforcement Administration has issued a registration to the WVDA to import industrial hemp seed from outside of the US. It is the applicant's responsibility to locate and purchase seed. When international suppliers are located, all information is passed to me using a "International Seed Source Form" and I will apply for an Import Permit on your behalf. Once approved by the DEA, I will forward the document to your supplier to include with the shipment. All international orders will be shipped to the WVDA's Guthrie Office. At that point I will arrange the distribution of seed to the applicant only. Seed will only be distributed to "**Full License**" holders. First time applicants will take possession of seed at the growing location during a site inspection visit. (*The possibility exists that the WVDA will receive industrial hemp seed for a "Provisional License" holder and not be able to distribute the seed to them. This would occur if the applicant failed to provide the required background checks or did not meet the approval of the WVDA.*)

**Harvest Responsibilities:**

Once the crop is established the applicant is responsible for notifying the WVDA 30 days before the projected harvest date. The WVDA will arrange to visit and collect sample/s to verify the THC content is below 0.3%. (*The cost of the visit, sampling and testing is the responsibility of the applicant. Costs can be estimated by the "Industrial Hemp Sampling Invoice". If the crop is tested and found to be more than the amount allowed, destruction may be required.*)

After the crop is harvested the applicant must complete a "Post Harvest Report". The report is due within 30 days of harvest. The objective is to collect information on the project in general. Information will be made available to the WV Legislature as required by the **Industrial Hemp Development Act**.

This letter is not meant to address every possible question about the process. As always, you should contact me at the email/telephone below for further questions or comments.

Regards,

Michael C. Arnold
Plant Regulatory Programs Coordinator
1900 Kanawha Blvd., East
Charleston, WV  25305
marnold@wvda.us
(304) 558-2212

mailing address: 1900 Kanawha Blvd. East, Charleston, WV 25305-0170

physical address: 217 Gus R. Douglass Lane, Charleston, WV 25312

telephone: 304-558-3550 • fax: 304-558-2203

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT HUNTINGTON

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                      Civil Action No. 3:18-cv-01289

MATTHEW MALLORY,
CAMO HEMP WV LLC,
GARY KALE, GRASSY RUN
FARMS, LLC, their agents,
servants, assigns, attorneys, and all
others acting in concert with the
named defendants,

        Defendants.

## VERIFICATION

STATE OF WEST VIRGINIA,

COUNTY OF KANAWHA, TO-WIT:

        M. T. Smith, after being duly sworn, deposes and says as follows:

        1.      I have read the VERIFIED COMPLAINT FOR DECLARATORY RELIEF;

TEMPORARY, PRELIMINARY, AND PERMANENT INJUNCTIVE RELIEF; ASSET

FORFEITURE; AND CIVIL PENALTIES ("Verified Complaint").

        2.      The facts stated in the Verified Complaint are true and correct to the best of my

knowledge, information, and belief.

        3.      The facts stated therein that are not within my personal knowledge are, upon

information and belief, true and correct, and I am informed and believe that the facts stated

therein are true and and correct.

MICHAEL T. SMITH
First Sergeant
West Virginia State Police
Bureau of Criminal Investigations

Taken, subscribed, and sworn to before me on this 11th day of September, 2018.  My

commission expires: April 26, 2020                              .

OFFICIAL SEAL
STATE OF WEST VIRGINIA
NOTARY PUBLIC
DIANA L. ROBERTS
1804 Anna Street
Charleston, WV 25302
My Commission Expires April 26, 2020

NOTARY PUBLIC

SEAL

JS 44   (Rev. 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| United States of America | Matthew Mallory; CAMO Hemp WV LLC; Gary Kale; Grassy Run Farms, LLC |

| **(b)**   County of Residence of First Listed Plaintiff | | County of Residence of First Listed Defendant   Allegheny County, PA |
|---|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | | NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| **(c)**   Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| Fred B. Westfall, Jr., AUSA<br>U.S. Attorney's Office<br>300 Virginia Street, E, Rm 4000, Charleston, WV 25301 | Unknown |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☒ 1   U.S. Government Plaintiff
- ☐ 2   U.S. Government Defendant
- ☐ 3   Federal Question   *(U.S. Government Not a Party)*
- ☐ 4   Diversity   *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                                      *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 485 Telephone Consumer Protection Act<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☒ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | ☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |
| | | | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1   Original Proceeding
- ☐ 2   Removed from State Court
- ☐ 3   Remanded from Appellate Court
- ☐ 4   Reinstated or Reopened
- ☐ 5   Transferred from Another District *(specify)*
- ☐ 6   Multidistrict Litigation - Transfer
- ☐ 8   Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
21 U.S.C. Sec. 801, et seq., Controlled Substances Act and Civil Asset Forfeiture

Brief description of cause:
Action to enjoin illegal conduct under controlled substances act.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*         JUDGE                                   DOCKET NUMBER

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 09/11/2018 | s/Fred B. Westfall, Jr., AUSA |

**FOR OFFICE USE ONLY**

RECEIPT #            AMOUNT            APPLYING IFP            JUDGE            MAG. JUDGE