**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT HUNTINGTON**


**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**                                    **Civil Action No. 3:18-CV-01289**

**MATTHEW MALLORY,**
**CAMO HEMP WV LLC,**
**GALE KALE, GRASSY RUN**
**FARMS, LLC, their agents,**
**servants, assigns, attorneys, and all**
**others acting in concert with the**
**named defendants,**

      **Defendants.**


**MEMORANDUM IN SUPPORT OF MOTION TO DISSOLVE**
**EX PARTE TEMPORARY RESTRAINING ORDER AND IN OPPOSITION TO**
**<u>PRELIMINARY INJUNCTION</u>**

COMES NOW, Defendant Matthew Mallory ("Mallory") and Defendant CAMO HEMP

WV, LLC ("CAMO") (collectively "CAMO Defendants"), by and through counsel, submit the

following in support of their Motion to Dissolve Ex Parte Temporary Restraining Order and in

opposition to the Motion of the United States of America (the "Government") for a Preliminary

Injunction.

**<u>INTRODUCTION</u>**

The fulcrum of the Government's case is the unsupported legal conclusion that West

Virginia law **requires** the CAMO Defendants to purchase industrial hemp seeds from international

suppliers.  From this misguided foundation, the Government then conjures up an argument that

lawful seeds and products cannot be purchased from a domestic seller or transported across state lines.  This is simply wrong.

According to the Government's strained theory: (i) because the CAMO Defendants did not import seeds from an overseas supplier, (ii) the CAMO Defendants are not in compliance with the West Virginia Industrial Hemp Pilot Program ("Pilot Program"), enacted pursuant to the West Virginia Industrial Hemp Development Act, W. Va. Code § 19-12E-1 *et seq*,; (iii) which renders the industrial hemp at issue to fall under the purview of the Controlled Substance Act, 21 U.S.C. §801 *et seq.* ("CSA").  Yet, because the bedrock legal foundation of the Government's argument is wrong, the Government's entire case against the CAMO Defendants dissolves.  Accordingly, the case against the CAMO Defendants, including the Temporary Restraining Order and the sought preliminary injunction, cannot stand.  CAMO Defendants hereby respectfully request that the Temporary Restraining Order be dissolved and that the Motion for Preliminary Injunction be denied.

## ARGUMENT

### A. The Government cannot meet the high standard required to maintain a temporary restraining order and to obtain a preliminary injunction.

A preliminary injunction is "an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied 'only in [the] limited circumstances' which clearly demand it" and is a "drastic remedy" that is "never awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008); *Direx Israel, Ltd. v. Breakthrough Med. Corp*., 952 F.2d 802, 811 (4th Cir. 1991) (citation omitted).  The Government cannot meet this burden.

To support the issuance of a preliminary injunction, the Government must demonstrate that "(1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the

public interest." *Williams v. Baltimore Cty. Gov't*, 696 F. App'x 105, 106 (4th Cir. 2017) (quoting *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008)) (internal quotations omitted).

The Government cannot carry its burden.

**B.  The Government is not likely to succeed on the merits.**

The Government is not likely to succeed on the merits.  In fact, the Government's position is contrary to law and/or has no support in established law.  The Verified Complaint is based upon an alleged violation of the Pilot Program, which in turn – according to the Government's theory – removed the CAMO Defendants' actions from the protection of the West Virginia Industrial Hemp Act.  However, because of the CAMO Defendants' actual compliance with the West Virginia Industrial Hemp Act and the associated Pilot Program, the CAMO Defendants' actions were lawful and do not warrant any of the relief sought by the Government.

While federal law has permitted the importation of industrial hemp parts for decades, until recently, domestic growth and cultivation of industrial hemp was prohibited. In 2014, the Agricultural Act of 2014 (7 U.S.C. § 5490) ("Farm Bill"), became law.  The Farm Bill establishes an expansive, permissive scheme for the domestic growth and cultivation of industrial hemp.  *See* 7 U.S.C.A. § 5490.  Pursuant to the Farm Bill, and "[n]otwithstanding the Controlled Substances Act (21 U.S.C. 801 et seq.)," institutions of higher education and state departments of agriculture may conduct an agricultural pilot program for the growth and cultivation of industrial hemp for research purposes, including commercial marketing studies.  *See id.* § 5490(a)(1), (b)(1)(A).

Under the authority of the Farm Bill, dozens of state departments of agriculture have established industrial hemp agricultural pilot programs, including Kentucky and West Virginia. *See* Ky. Rev. Stat. Ann. §§ 260.850-260.869; W. Va. Code Ann. §§ 19-12E-1 thru 9.  A licensee of the Kentucky Industrial Hemp Research Pilot Program ("KIHRPP"), or his or her agent, may

legally grow, cultivate, handle, or process industrial hemp or industrial hemp products in Kentucky. Ky. Rev. Stat. Ann. § 260.858(2). Similarly, a licensee of West Virginia's Industrial Hemp Act may "plant, grow, harvest, possess, process, sell or buy industrial hemp." W. Va. Code § 19-12E-4.

To further the reach of the Farm Bill, and reaffirm the legality of industrial hemp, Congress included protective language in the Consolidated Appropriations Act for Fiscal Year 2016 ("Omnibus Law"). Since extended on March 23, 2018, as effective through FY2018, the Omnibus Law sets forth:

> ***None of the funds made available by this Act or any other Act may be used***—
> (1) in contravention of section 7606 of the [Farm Bill]; or
> (2) ***to prohibit the transportation, processing, sale, or use of industrial hemp, or seeds of such plant, that is grown or cultivated in accordance with subsection section 7606 of the [Farm Bill], within or outside the State in which the industrial hemp is grown or cultivated***.[1]

Consolidated Appropriations Act, 2018, Public Law No. 115-141 § 729 (https://www.congress.gov/bill/115th-congress/house-bill/1625/text) (emphasis added).

In other words, the Omnibus Law prohibits federally-appropriated units, including the Drug Enforcement Administration and the office of the U.S. Attorney for the Southern District of West Virginia, from expending federal appropriations to interfere with or otherwise frustrate the intrastate or interstate transportation of industrial hemp grow or cultivated as part of a Farm Bill-authorized agricultural pilot program. This prohibition applies to the transportation of Farm Bill industrial hemp whether transported within ***or outside*** the state in which it was grown or cultivated.

---

[1] This language in the Omnibus Law directly contradicts and preempts the Statement of Principles on Industrial Hemp identified by the Government as Exhibit A to its Verified Complaint. The most recent Omnibus Law was adopted as law on March 23, 2018, nearly two years after the Statement of Principles, demonstrating that Congress intended that no federal agency should be permitted to prohibit the transportation of industrial hemp, including seeds, between States. Furthermore, a Statement of Principles does not have the force and effect of law and cannot override enacted law.

*Id.*

        1.  *CAMO Defendants were in compliance with the West Virginia Industrial Hemp Development Act and the Pilot Program.*

The Government's entire justification for the Temporary Restraining Order, the preliminary injunction, and the entire suit rests on its unfounded and unsupported allegations that the CAMO Defendants violated the Pilot Program. Accordingly, the Government's case dissolves when confronted with the actual law of West Virginia.

The WVDA does not **require** growers under the Pilot Program to buy seeds from international sources. Instead, in those instances where a grower **elects** to by internationally, the Pilot Program requires them to follow the proper procedures through the WVDA. Notably, the Government fails to cite to any law to support this assertion in either its Memorandum in Support or its Verified Complaint. This is no mere oversight, because no such requirement exists. An examination of the entire Act and the regulations promulgated under its authority reveal no such requirement is imposed in the West Virginia Industrial Hemp Development Act. *See* W. Va. Code § 19-9E-1 *et seq.* and W. Va. C.S.R. § 61-29-1 *et seq.*

Instead, the Government points to a section on a WVDA's publication regarding the Pilot Program. (Memo in Support at 3; Ex. F to the Verified Complaint.) The publication appears to be a letter from Plant Regulatory Programs Coordinator, Michael C. Arnold, explaining the process of the Pilot Program after an individual has submitted his/her application. The section on "Obtaining Seed and Import Permits" details the methods by which a grower can obtain international seeds. (Ex. F to the Verified Complaint.) No where in that letter, nor in any other WVDA publication that CAMO Defendants are aware of, does the WVDA decree that all seeds

5

must be imported.  Instead, it provides a mechanism by which growers may obtain international seeds.[2]

In fact, the only requirement contained within the Pilot Program related to seeds is that a grower must provide documentation to the WVDA "showing that the seeds planted are of a type and variety certified to contain no more than one percent THC."  W. Va. Code § 19-12E-6(a)(1); W. Va. C.S.R. §  61-29-4.  The Government has offered no evidence that the CAMO Defendants have not complied with this requirement.

Furthermore, there is no expressed limitation preventing those involved with the Pilot Program from sending the harvested plant to other states.  There is nothing in West Virginia law that imparts such an obligation on growers **or** that would suggest a grower who buys seeds from another state would be subject to suspension or revocation of its industrial hemp license.  *See* W. Va. C.S.R. § 61-29-1 *et seq.*  In fact, as discussed below, the federal law has developed to permit the interstate transportation of industrial hemp and all of its plant parts.  Accordingly, CAMO Defendants' intention to send the harvested product out of West Virginia similarly does not violate the Pilot Program.

Given that the CAMO Defendants were in compliance with the West Virginia Industrial Hemp Act at all times relevant and that the actions complained of by the Government do not

---

[2]     Indeed, a review of the full document from which it appears Ex. F to the Verified Complaint was taken provides additional context to demonstrate the permissive nature of obtaining international seed. (Letter to Applicants for 2019 Industrial Hemp Growing Season, attached as "Exhibit A.")  The document includes an "International Seed Source Form."  The form identifies itself as being for all seed requiring a US DEA Import permit.  Certainly, if all seeds were required to be obtained internationally, there would be no need to distinguish the form as being for "international seeds" and for seeds requiring a US DEA import permit.

Notably, to the extent this Court adopts the Government's interpretation of the international seed discussion in the letter to applicants, the letter relied upon by the US is the letter directed to applicants for the 2019 growing season.  The letter to the applicants for the 2018 growing season, the season for which the Government now seeks to prevent the CAMO Defendants from harvesting contains no such section.  (*See* Letter to Applicants for 2018 Industrial Hemp Growing Season, attached as "Exhibit B.")  Accordingly, even to the extent this Court were to conclude that the language of the letter related to the 2019 growing season imposed some type of requirement on growers to obtain international seeds, such an obligation could not be retroactively attached to growers for the 2018 season.

qualify as violations of the Pilot Program, the CAMO Defendants were acting lawfully and in complete compliance with state and federal law.

2. *The actions of the CAMO Defendants did not violate the CSA.*

The Government's statements of law and positions taken related to the CSA are not consistent with the law as developed with regard to industrial hemp.

a. <u>The Government has misidentified all parts and species of the cannabis plant as marijuana.</u>

As an initial matter, the Government has conflated industrial hemp with marijuana. (Verified Complaint at 29.) This is an unfortunate misconception. Although both industrial hemp and marijuana are Cannabis sativa L., a species of the plant genus cannabis, they are botanically distinct. By federal definition, industrial hemp contains only trace levels of THC, a cannabinoid with the capability of producing a psychoactive high. 7 U.S.C.A. § 5940(b)(2). Industrial hemp is non-psychoactive and non-hallucinogenic. Marijuana, on the other hand, contains higher levels of THC and has a psychoactive chemical profile. It is grown and use precisely because of its psychoactive and hallucinogenic tendencies. Industrial hemp, and all of its plant parts, that comports with the Farm Bill's definition of industrial hemp, is not marijuana.

b. <u>Interstate transportation of industrial hemp seeds is federally legal and protected from interference by federally-appropriated units.</u>

In numerous allegations, the Government inaccurately illegalizes the interstate transportation of industrial hemp and all of its plant parts, including seeds. (*See* Verified Complaint at 31-32, 34.) As summarized above, together, the Farm Bill and Omnibus Law create a protective federal framework for the interstate transportation of all parts of the industrial hemp plant. No federally-appropriated unit may use federal appropriations to interference with or otherwise

frustrate the interstate transportation of industrial hemp grown or cultivated pursuant to the Farm Bill.

c. The seeds are industrial hemp lawfully grown or cultivated pursuant to the Farm Bill.

In 2014, the Kentucky Department of Agriculture ("KDA") established KIHRPP under the authority of the Farm Bill. *See* Kentucky Department of Agriculture, "Industrial Hemp Research Pilot Program Overview," KYAGR.COM, http://www.kyagr.com/marketing/hemp-overview.html (last accessed Sept. 14, 2018); *see also* Ky. Rev. Stat. Ann. § 260.852(10). For four growing seasons, KDA has facilitated the program in compliance with the Farm Bill. In fact, KIHRPP has become one of the United States' leading Farm Bill-authorized agricultural pilot program; as of September 2018, KIHRPP has 296 licensed participants, including 210 growers, and covers 6,700 planted acres. *See* Kentucky Department of Agriculture, "Industrial Hemp Research Pilot Program Overview," KYAGR.COM, http://www.kyagr.com/marketing/hemp-overview.html (last accessed Sept. 14, 2018).

The Verified Complaint alleges that subject seeds at issue in this action were grown and/or cultivated by Hickman Seed & Grain Company, LLC ("Hickman"). Upon information and belief, Hickman is a duly licensed participant of KIHRPP. *See* Kentucky Department of Agriculture Industrial Hemp Research Pilot Program, "2018 License Holder List," KYAGR.COM, http://www.kyagr.com/marketing/documents/HEMP_OV_License-Holder-List_2018.pdf (last accessed Sept. 14, 2018). Kentucky's definition of industrial hemp matches the Farm Bill's definition, which captures all industrial hemp plant parts, including seeds. 7 U.S.C.A. § 5940(b)(2); Ky. Rev. Stat. Ann. § 260.850(5). Accordingly, seeds from industrial hemp grown or cultivated by Hickman as part of KIHRPP are protected parts of the industrial hemp plant. As a

result, pursuant to the Farm Bill and Omnibus Law, they are clearly legal as a matter of federal law and may move in interstate commerce without violating federal law, including the CSA.

Mallory and CAMO allegedly acquired the industrial hemp seeds at issue in this action from Hickman. (Verified Complaint at 33.) As the Farm Bill and Omnibus unmistakably provide, the seeds were federally legal industrial hemp parts when present with Hickman in Kentucky and remained federally legal industrial hemp parts during the course of their interstate transportation to West Virginia. Their entry into West Virginia does not, in any way, deprive them of their status as industrial hemp grown or cultivated pursuant to KIHRPP, a Farm Bill-authorized agricultural pilot program. To find otherwise would invalidate supreme federal law.

When they acquired, Mallory and CAMO did not come into possession of controlled substances. Instead, they came into possession of federally legal industrial hemp parts, which were lawfully grown or cultivated by a licensed participant of KIHRPP pursuant to the Farm Bill and, therefore, excepted from treatment as a controlled substance under the CSA. Any liability that the Government seeks to impose against Mallory and CAMO under the CSA does not attach.

d.  Industrial hemp grown or cultivated pursuant to the Farm Bill is not a controlled substance under the CSA.

While the CSA "establishes a comprehensive federal scheme to regulated controlled substances," industrial hemp grown or cultivated pursuant to the Farm Bill is not a controlled substance under the CSA. (Verified Complaint at 26.) Indeed, crops cultivated pursuant to the Farm Bill are explicitly and specifically exempted from the CSA, as well as all other federal laws. *See* 7 U.S.C.A. § 5490(a). Thus, when parts of the Cannabis sativa L. constitute industrial hemp grown or cultivated pursuant to a Farm Bill-authorized agricultural pilot program, they are not marijuana under schedule I of the CSA. Liability under the CSA that might otherwise attach to marijuana does not attach to industrial hemp grown or cultivated pursuant to the Farm Bill.

9

The Government incorrectly asserts that the CSA designates any material which contains any quantity of THC as a schedule I controlled substance. (Verified Complaint at 29.)  The Farm Bill defines industrial hemp as "the plant Cannabis sativa L. and any part of such plant, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C.A. § 5940(b)(2). Clearly, the Farm Bill, in spite of the CSA, and other federal drug abuse laws, permits the presence of limited amounts of THC in federally legal industrial hemp. Despite the Government's assertions, federally legally industrial hemp may contain up to 0.3% THC without running afoul of federal law, including the CSA.

A review of applicable law makes it clear that the Government is not likely to succeed on the merits of the case.  This factor is in favor of the CAMO Defendants.

**C. The balance of equities tips in favor of the CAMO Defendants and in dissolving the Temporary Restraining Order and denying the sought preliminary injunction.**

In considering the equities, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Marietta Mem'l Hosp. v. W. Virginia Health Care Auth.*, No. 2:16-CV-08603, 2016 WL 7363052, at *9 (S.D.W. Va. Dec. 19, 2016) (citing *Winter*, 555 U.S. at 24).  Granting the preliminary injunction will result in substantial injuries to CAMO Defendants such that the balancing of the equities does not weigh in the favor of the Government.

The CAMO Defendants have invested considerable resources to grow and prepare their legal product for harvest.  Considering the cost of the industrial hemp license, the cost of the seed, and costs incurred during the growing season, CAMO Defendants have already invested significant financial resources to bring this crop to harvest.  (Aff. of M. Mallory (Sept. 14, 2018), attached as "Exhibit C.")  Additionally, CAMO Defendants have a contract with for the purchase of the entire crop.  If the subject crop of industrial hemp is not harvested soon, then the hemp will

rot and be unusable.  (Ex. C.)  As a result, CAMO Defendants will lose all potential profits from the sale of the crop, their contractual obligations will be jeopardized, and they will suffer significant financial hardship.

Once again, this factor is in favor of the CAMO Defendants.

**D. The Government is not likely to suffer irreparable harm if the Temporary Restraining Order is dissolved and the preliminary injunction is denied.**

The irreparable harm that the Government asserts it will suffer is extremely speculative and can be mitigated by other potential options.

The Government argues that permitting the CAMO Defendants to harvest the subject crop would destroy evidence of a violation of the CSA.  Putting aside the argument related to the alleged violation, the Government has not identified any reason why it requires the entire hemp crop as evidence.  As required under the Pilot Program, the industrial hemp will/has been tested by the WVDA to ensure that it meets the requirements of the Pilot Program prior to harvest.  The Pilot Program requires that the crop be tested prior to harvest to ensure that the THC content, the cannabinoid with the capability of producing a psychoactive high, is at permissible levels.  *See* W. Va. C.S.R. § 61-29-5; (*See also* Ex. F to the Verified Complaint.)  Such tests could reasonably be available to the Government upon an inquiry to the Pilot Program.  Furthermore, the CAMO Defendants, as demonstrated in this filing, do not dispute the location from which the subject seeds were obtained.  Therefore, the plants are not required to prove the lineage of the plants.  CAMO Defendants cannot think of any evidentiary need here that would require the preservation of the entire crop to the point it will rot in the ground.

Additionally, the Government asserts that if CAMO Defendants are permitted to harvest the crop, that what it argues to be "illegal cannabis" will be allowed to enter into the stream of commerce and create a greater violation of the CSA.  As detailed above, the industrial hemp at

11

issue is entirely lawful and permitting the CAMO Defendants to harvest and properly sell the same would not constitute any illegal activity.  Furthermore, the Government attempts to paint an illegitimate vision of illegal drugs flooding the streets.  As discussed above, the subject crop will be tested by the WVDA prior to harvest.  Any hemp with a THC content above the lawful amount will be subject to destruction and reporting to West Virginia law enforcement agency.  W. Va. C.S.R. § 61-29-5.  Therefore, the current procedures that the subject industrial hemp is already subject to will ensure that only non-psychoactive and non-hallucinogenic industrial hemp is permitted to be harvested.

Accordingly, the "irreparable harm" of which the Government complains of to justify its Temporary Restraining Order and preliminary injunction is incredibly speculative and is already protected against by the procedures and processes put into place by the Pilot Program.

**E.  The public interest is not served by granting the preliminary injunction.**

The Government is correct in its statement that Congress has already addressed this point. Congress has specifically held that developing industrial hemp as a crop is in the public interest. (*See above.*)  It has further specified that it is in the best interest that the federal government not interfere with the interstate commerce of industrial hemp.  (*Id.*)  Accordingly, the public interest requires that the CAMO Defendants be permitted to continue in its lawful work contemplated by state and federal law and that the Temporary Restraining Order be dissolved and the preliminary injunction denied.

<u>**CONCLUSION**</u>

For the reasons set forth above, the Government cannot meet the high burden established to maintain the subject Temporary Restraining Order or to grant the Motion for Preliminary Injunction.  Accordingly, the CAMO Defendants request the CAMO Defendants hereby

12

respectfully request that the Temporary Restraining Order be dissolved and that the Motion for

Preliminary Injunction be denied.

Respectfully submitted,

/s/ Carte P. Goodwin
Carte P. Goodwin (WVSB #8039)
Elise McQuain (WVSB #12253)
FROST BROWN TODD LLC
500 Virginia Street, East
Suite 1100
Charleston, WV  25301
Phone: 304-345-0111 | Fax: 304-345-0115
Email: cgoodwin@fbtlaw.com
        emcquain@fbtlaw.com

Philip A. Reale, II (WVSB #11372)
Law Office of Philip A. Reale, PLLC
300 Summers Street, Suite 980
Charleston, WV 25301
Phone: 304-342-1891
Fax: 304-342-1893
Email: philip@wvreale.com

13

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT HUNTINGTON

**UNITED STATES OF AMERICA,**

       **Plaintiff,**

**v.**                                      **Civil Action No. 3:18-CV-01289**

**MATTHEW MALLORY,**
**CAMO HEMP WV LLC,**
**GALE KALE, GRASSY RUN**
**FARMS, LLC, their agents,**
**servants, assigns, attorneys, and all**
**others acting in concert with the**
**named defendants,**

       **Defendants.**

### CERTIFICATE OF SERVICE

       I, Carte P. Goodwin, hereby certify that on this day, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following counsel of record:

| | |
|---|---|
| Fred B. Westfall, Jr. | R. Booth Goodwin II |
| Assistant United States Attorney | Tammy J. Owen |
| Attorney for the United States | GOODWIN & GOODWIN, LLP |
| P.O. Box 1713 | 300 Summers St., Suite 1500 |
| Charleston, WV 25326 | Charleston, WV 25301 |
| Phone: 30-345-2200 | Telephone: (304) 346-7000 |
| Fax: 304-347-5443 | Facsimile: (304) 344-9692 |
| Fred.westfall@usdoj.gov | rbg@goodwingoodwin.com |
| *Counsel for USA* | tjo@goodwingoodwin.com |
| | *Counsel for Gary Kale and Grassy* |
| | *Run Farms, LLC* |

Dated this 15th day of September 2018.

                                         /s/ Carte P. Goodwin

                                         Carte P. Goodwin (WV Bar No. 8039)