IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                    CIVIL ACTION NO.   3:18-1289

MATTHEW MALLORY,
ALTERNATIVE MEDICINAL OPTIONS LLC,
GARY KALE,
GRASSY RUN FARMS, LLC, their agents,
assigns, attorneys, and all other acting
in concert with the named defendants,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are Motions to Dismiss by Defendants Matthew Mallory (Mr. Mallory) and Commonwealth Alternative Medicinal Options, LLC (collectively the "CAMO Defendants") and Gary Kale and the Grassy Run Farms, LLC, (collectively the "Grassy Run Defendants"). ECF Nos. 28 & 34. The CAMO Defendants also have filed a Motion for Leave to File Supplemental Authority (ECF No. 51), and the United States has filed a Motion for Leave to File an Amended Verified Complaint for Declaratory Relief. ECF No. 48. For the following reasons, the Court **GRANTS** the motions to dismiss, **GRANTS** the motion to file supplemental authority, and **DENIES** the motion to amend.

**I.
FACTUAL AND
PROCEDURAL BACKGROUND**

The United States brought this action on September 11, 2018, seeking an Ex Parte Temporary Restraining Order (TRO) and Preliminary Injunction, with the ultimate goal of

securing a Permanent Injunction and other relief. With respect to the TRO, the Court **GRANTED** the motion and scheduled a preliminary injunction hearing for September 17, 2018. In the meantime, the TRO prevented the CAMO Defendants and the Grassy Run Defendants from, *inter alia*, harvesting and transporting certain cannabis plants across state lines.

The cannabis at issue in this case was grown under an "industrial hemp" pilot program in West Virginia. At the time, "industrial hemp" was defined as "the plant Cannabis sativa L. and any part of such plant, whether growing or not, with a delta-9 tetrahydrocannabinol concentration [(THC)] of not more than 0.3 percent on a dry weight basis." 7 U.S.C. § 5940.[1] Mr. Mallory, using the business name CAMO HEMP WV LLC, applied for and received a Research and Marketing Cultivation of Industrial Hemp License from the West Virginia Department of Agriculture (WVDA) to grow the plants. The seeds used by Defendants were purchased from a supplier in Kentucky[2] and shipped directly to Grassy Run Farms in West Virginia. The seeds were then planted and grown on property located in Mason County, West Virginia. The United States claims the property is owned by Grassy Run Farms, LLC, and Gary Kale is an employee of that company.

---

[1] Hemp is now defined in 7 U.S.C. § 1639*o* as "the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. § 1639*o* (effective Dec. 20, 2018).

[2] The seeds were shipped from Hickman Seed & Grain, LLC in Kentucky. *Delivery Receipt*, ECF No. 3-5. It appears that Hickman Seed & Grain is a duly licensed participant of Kentucky's pilot program. *See* Kentucky Department of Agriculture Industrial Hemp Research Pilot Program, "2018 License Holder List," http://www.kyagr.com/marketing/documents/HEMP_OV_License-Holder-List_2018.pdf (last visited on March 1, 2019).

In its Verified Complaint, the United States alleges Defendants conspired together to violate the law with respect to the project, and they failed to follow the project description submitted by the CAMO Defendants to the WVDA. Specifically, the United States argues that Defendants violated the Controlled Substances Act (CSA), 21 U.S.C. § 801 *et seq.*, when they obtained the cannabis seeds from Kentucky. Additionally, the United States asserts Defendants will continue to violate the CSA if, as intended, they transport harvested portions of those plants to Pennsylvania.

Upon hearing the parties' arguments, the Court converted the TRO into a preliminary injunction. The Court allowed Defendants to harvest, dry, and process the cannabis, but the Court prohibited Defendants from transporting or selling it after it was processed.[3] The harvesting, drying, and milling process took several weeks to complete. In the interim period, the parties filed and briefed the current motions. However, as a result of a lack of congressional appropriations, civil cases in this District with the United States as a party were stayed on December 26, 2018. *Gen. Order Holding Civ. Matters in Abeyance,* Misc. No. 2:18-mc-00196 (Dec. 26, 2018) (Berger, J.).[4]

The CAMO Defendants then moved to lift the stay because they had a time-sensitive contractual obligation to deliver cannabidiol (CBD) isolate, a hemp extract, by the end of January 2019. The CAMO Defendants represented to the Court that they had to take the plant

---

[3] On October 22, 2018, the Court entered an Order prohibiting Defendants from transporting the hemp outside of West Virginia.

[4] A second General Order was entered on January 8, 2019, continuing the stay. *Gen. Order Holding Civ. Matters in Abeyance*, (Jan. 8, 2019) (Berger, J.).

material to a facility in Pennsylvania to be processed in order to fulfill the contract. Given that the passage of time had changed the circumstances of the CAMO Defendants because of the looming contractual deadlines, and the fact the Court had become increasingly doubtful as to the merits of the United States' case, the Court lifted the stay and exercised its inherent authority to dissolve the preliminary injunction.[5] The Court permitted Defendants to immediately transport the product to Pennsylvania to be processed into CBD isolate. Now, upon consideration of the merits of Defendants' motions to dismiss, the Court rules in their favor.

## II.
## STANDARD OF REVIEW

The facts essential to resolving the current motions are not in dispute. Although the Court herein considers several documents submitted by the parties, no party has challenged the authenticity of these documents and many of them are attached and integral to the Verified Complaint. Of those the Court references that are not attached to the Verified Complaint, almost all are public records. The only documents the Court mentions that do not fit into one of these categories is a handout by CAMO and three letters. The handout by CAMO was submitted by the United States to support its argument. However, the Court finds that this handout does nothing to change this Court's legal analysis, and the Court does not rely upon it. With regard to the letters, two are from Jennifer S. Greenlief dated September 11 and 14, 2018, and the other is from Mr. Mallory dated September 21, 2019. As is explained below, the letters also do not change this

---

[5] After the Court entered its Memorandum Opinion and Order, the United States immediately moved to stay and argued for the first time that the plants may have a THC level that exceeds the limit to qualify it as hemp. The Court entered a temporary stay and an expedited briefing schedule. In Response, the CAMO Defendants provided documentation showing the THC level was well below the legal limit. Based upon this testing and the fact the United States' argument was pure speculation and conjecture, the Court denied the United States' motion. *Mem. Op. and Order*, at 2-3, ECF No. 71.

Court's legal conclusions. They are merely cited to provide background information. Therefore, as the Court finds that all the documents it does rely upon are either integral to the Verified Complaint or a public record, the Court will not convert Defendants' motions into ones for summary judgment and will consider them under the motion to dismiss standard.

Pursuant to the dismissal standard, courts must look for "plausibility" in the complaint. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563-64 (2007). In other words, the United States in this case must set forth the "grounds" for an "entitle[ment] to relief" that is more than mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 555 (internal quotation marks and citations omitted). Accepting the factual allegations in the Verified Complaint as true, they "must be enough to raise a right to relief above the speculative level . . . ." *Id*. (citations omitted). If the allegations in the complaint, assuming their truth, do "not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Id*. at 558 (internal quotation marks and citations omitted). In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court explained that, although factual allegations in a complaint must be accepted as true for purposes of a motion to dismiss, this tenet does not apply to legal conclusions. 556 U.S. at 678.

### III.
### DISCUSSION

The fundamental question this Court must resolve is a legal one, that is whether Defendants violated any federal laws in procuring, cultivating, processing, or selling the cannabis at issue. Under the CSA, controlled substances are divided into five schedules. 21 U.S.C. § 812(a). Schedule I substances, which includes marijuana, are the most tightly controlled. *Id*. at § 812(b)(1). The CSA expressly prohibits the manufacture, distribution, or disbursement of a Schedule I

controlled substance without a Drug Enforcement Administration (DEA) registration. *Id*. at §§ 822, 823, 841(a). Notably, at the time this action was brought, the CSA defined "marihuana" as including "all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin." 21 U.S.C. § 802(16). CBD is a derivative product of the Cannabis sativa L. plant.

In 2014, Congress passed the Agriculture Act of 2014, Pub. L. 113-79, title VII, § 7606 (codified at 7 U.S.C. § 5940 (2014) (the "2014 Farm Bill")). As part of the Act, Congress carved out a special exception to the CSA under certain circumstances, for the domestic growth, cultivating, and marketing of industrial hemp. This exception, set forth in 7 U.S.C. § 5940(a) provided:

> (a) In general
>
> Notwithstanding the Controlled Substances Act . . . or any other Federal law, an institution of higher education . . . or a State department of agriculture may grow or cultivate industrial hemp if--
>
>> (1) the industrial hemp is grown or cultivated for purposes of research conducted under an agricultural pilot program or other agricultural or academic research; and
>>
>> (2) the growing or cultivating of industrial hemp is allowed under the laws of the State in which such institution of higher education or State department of agriculture is located and such research occurs.

7 U.S.C. § 5940(a) (2014). Thereafter, an "agricultural pilot program" is defined as:

> a pilot program to study the growth, cultivation, or marketing of industrial hemp--
>
>> (A) in States that permit the growth or cultivation of industrial hemp under the laws of the State; and

>> (B) in a manner that--
>>
>>> (i) ensures that only institutions of higher education and State departments of agriculture are used to grow or cultivate industrial hemp;
>>>
>>> (ii) requires that sites used for growing or cultivating industrial hemp in a State be certified by, and registered with, the State department of agriculture; and
>>>
>>> (iii) authorizes State departments of agriculture to promulgate regulations to carry out the pilot program in the States in accordance with the purposes of this section.

7 U.S.C. § 5940(b)(1) (2014). Pursuant to the 2014 Farm Bill, industrial hemp includes "any part" of the plant Cannabis sativa L., "whether growing or not," so long as it has a delta-9 tetrahydrocannabinol concentration (THC) of 0.3 percent or less based on dry weight. *Id*. at § 5940(b)(2) (2014). THC is the psychoactive component of Cannabis sativa L. THC at 0.3 percent or less is insufficient to have a narcotic effect. *Cockrel v. Shelby Cty. Sch. Dist*., 270 F.3d 1036, 1042 (6th Cir. 2001) (citation omitted). Thus, rather than defining industrial hemp on the part of the plant used, the 2014 Farm Bill defined industrial hemp on the level of THC it contains. However, as the CSA continued to define marijuana broadly as the entire Cannabis sativa L. plant, including its seeds and extracts,[6] conflicts arose between agencies charged with enforcing the CSA and those who sought to promote and explore the hemp industry under the 2014 Farm Bill.

---

[6]*See* 21 U.S.C. § 802(16) (defining "marihuana" under the CSA).

In reaction to this tension, in December 2015, Congress adopted language in the Consolidated Appropriations Act of 2016 (the "2016 Spending Bill") to address the issue. This Spending Bill provided, in part:

> None of the funds made available by this Act or any other Act may be used—
>
> (1) in contravention of section 7606 of the Agricultural Act of 2014 (7 U.S.C. 5940); or
>
> (2) *to prohibit the transportation, processing, sale, or use of industrial hemp that is grown or cultivated in accordance with subsection section 7606 of the Agricultural Act of 2014, within or outside the State in which the industrial hemp is grown or cultivated*.

Consolidated Appropriations Act of 2016, Pub. L. No. 114-113, § 763, 129 Stat. 2242, 2285 (2015) (italics added). This language was repeated in the 2017 Spending Bill. Consolidated Appropriations Act of 2017, Pub. L. No. 115-31, § 773, 131 Stat. 135, 182 (2017). In the 2018 Spending Bill, which was passed on March 23, 2018 and was effective through the 2018 fiscal year, the phrase "or seeds of such plant" was added to subsection (2) to provide: "None of the funds . . . may be used . . . to prohibit the transportation, processing, sale, or use of industrial hemp, or seeds of such plant . . . ." Consolidated Appropriations Act of 2018, Pub. L. No. 115-141, § 729, 132 Stat. 348, 388 (2018). Thus, by the time the seeds were purchased in this case, these Spending Bills made it clear that agencies, such as the United States Attorney's Office and the Drug Enforcement Agency (DEA), cannot use federal funds to prohibit the interstate or intrastate "transportation, processing, sale, or use of industrial hemp, or seeds of such plant, that is grown or cultivated in accordance" with the 2014 Farm Bill. *Id*.

After the passage of the 2016 Spending Bill, however, the United States Department of Agriculture, the DEA, and the Food and Drug Administration (FDA) issued a

Statement of Principles on Industrial Hemp (SOP) on August 12, 2016. Although they recognized in the SOP that States could adopt industrial hemp agricultural pilot projects, they took the position that "[i]ndustrial hemp plants and seeds may not be transported across State lines." *Statement of Principles on Industrial Hemp*, 81 FR 53395-01, 2016 WL 4240092 (Aug. 12, 2016). In addition, the SOP provided that, while authorized entities could "grow or cultivate" industrial hemp under the 2014 Farm Bill, it "did not eliminate the requirement under the Controlled Substances Import and Export Act that the importation of viable cannabis seeds must be carried out by persons registered with the DEA to do so." *Id*. at 53395-53396.[7] Although the SOP acknowledged that it "does not establish any binding legal requirements,"[8] on December 14, 2016, the DEA established a new drug code for marijuana extract, codified at 21 C.F.R. § 1308.11(d)(58). Establishment of a New Drug Code for Marihuana Extract, 81 FR 90194-01 (Dec. 14, 2016). This Rule created a new DEA Controlled Substance Code Number under Schedule I for "marihuana extract," which is defined as an "extract containing one or more cannabinoids that has been derived from any plant of the genus Cannabis, other than the separated resin (whether crude or purified) obtained from the plant." 21 C.F.R. § 1308.11(d)(58).

In the meantime, and despite the DEA's position, individual States seized upon the opportunity under the 2014 Farm Bill to grow, cultivate, and market industrial hemp. Capitalizing

---

[7] The SOP also placed a more restrictive definition on "industrial hemp" than was included in the 2014 Farm Bill, by adding the phrase "including seeds of such plant" and ""[t]he term 'tetrahydrocannabinols' includes all isomers, acids, salts, and salts of isomers of tetrahydrocannabinols[.]" *Id*. It further appears to limit "industrial hemp" to only "that [which] is used exclusively for industrial purposes (fiber and seed)." *Id*. The 2014 Farm Bill's definition of legal industrial hemp was not restricted to fiber and seed, nor non-industrial use.

[8] *Id.* at 53396.

on this burgeoning market, both West Virginia and Kentucky established industrial hemp agricultural pilot programs under the auspices of their respective Departments of Agriculture. *See* W. Va. Code § 19-12E-1 thru 9, (the Industrial Hemp Development Act); Ky. Rev. Stat. §§ 260.850-260.869 (Marketing of Agricultural Products: Industrial Hemp). West Virginia's Industrial Hemp Development Act provides that the Commissioner of Agriculture is responsible to regulate industrial hemp[9] and "license qualified persons . . . to lawfully grow or cultivate industrial hemp in this state[.]" W. Va. Code § 19-12E-5(e). An individual licensed in West Virginia "may plant, grow, harvest, possess, process, sell or buy industrial hemp." W. Va. Code § 19-12E-4. Additionally, if an individual is licensed by the Commissioner, that individual "is presumed to be growing industrial hemp for commercial purposes." W. Va. Code § 19-12E-5(d). Similarly, Kentucky's Department of Agriculture has the authority to regulate hemp pilot programs and "[l]icense persons who wish to participate in an industrial hemp research pilot program by cultivating, handling, processing, or marketing industrial hemp[.]" Ky. Rev. Stat. § 260.862. Under Kentucky's program, "it is lawful for a licensee, or his or her agent, to cultivate, handle, or process industrial hemp or industrial hemp products in the Commonwealth." Ky. Rev. Stat. § 260.858(2).

In this case, however, the United States contends that Defendants violated the CSA because they obtained the seeds without a DEA registration number and, thus, were not authorized under the CSA's definition of "marihuana" to manufacture, distribute, or dispense it, or possess it

---

[9]West Virginia's Commissioner of Agriculture has rule-making authority that includes, but is not limited to, testing, supervising, and assessing a fee upon industrial hemp. W. Va. Code § 19-12E-7(1)-(3). The Commissioner specifically is responsible to "[p]romulgate rules relating to the production and sale of industrial hemp which are consistent with the rules of the United States department of justice, drug enforcement administration for the production, distribution and sale of industrial hemp; and . . . [a]ny other rules and procedures necessary to carry out the purposes of this article." W. Va. Code § 19-12E-7(4)-(5).

with the intent to manufacture, distribute or dispense it. Additionally, the United States argues that those licensed under a State program cannot exceed the scope of the State's DEA registration. *See* 21 U.S.C. § 822(b) (providing that those with a DEA registration only may act "to the extent authorized by their registration"). In this case, the WVDA's registration number is limited to the international importation of Schedule I Cannabis sativa L. seeds. Instead of receiving the seeds directly from the supplier in Kentucky, the United States contends Defendants only could get the seeds legally from the WVDA pursuant to its DEA registration number. As the seeds here were sent across State lines directly from the seed supplier in Kentucky to Defendants in West Virginia, the United States asserts the seeds were illegally obtained.

However, upon review, the Court disagrees with the United States' position. The relevant section of 2014 Farm Bill begins with the phrase "[n]otwithstanding the Controlled Substances Act . . . or any other Federal law," industrial hemp can be grown and cultivated in a State under certain conditions. 7 U.S.C. § 5940. Although at the time the 2014 Farm Bill was passed Congress did not amend the definition of "marihuana" under the CSA, its use of the term "notwithstanding" indicates Congress intended to override any conflicting provisions in the CSA. *See Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18 (1993) (stating "the use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section"); *United States v. Lambert*, 395 F. App'x 980, 981 (4th Cir. 2010) (citing *Cisneros* and finding that the "notwithstanding" language in the Mandatory Victims Restitution Act supersedes conflicting federal statutes).

The 2014 Farm Bill expressly permits growing, cultivating, and marketing industrial hemp under State pilot programs. *See* 7 U.S.C. § 5940(b)(2). When tensions arose between enforcement of the broad language in the CSA and the narrow exception for industrial hemp carved out from the 2014 Farm Bill, Congress reacted by inserting language in the 2016 Spending Bill to bar enforcement agencies from using appropriations "to prohibit the transportation, processing, sale, or use of industrial hemp that is grown or cultivated in accordance with [the 2014 Farm Bill], within or outside the State in which the industrial hemp is grown or cultivated." Consolidated Appropriations Act of 2016, Pub. L. No. 114-113, § 763, 129 Stat. 2242, 2285 (2015). This language was repeated in both the 2017 and 2018 Spending Bills, with the addition of the phrase "or seeds of such plant" in the 2018 version. Consolidated Appropriations Act of 2017, Pub. L. No. 115-31, § 773, 131 Stat. 135, 182 (2017); Consolidated Appropriations Act of 2018, Pub. L. No. 115-141, § 729, 132 Stat. 348, 388 (2018).

Obviously, this language was included in the Spending Bills to clear up any doubt that Congress did not want these enforcement agencies from interfering with industrial hemp under the 2014 Farm Bill. Notably, the Spending Bills provided that such agencies were not to prevent the transportation or sale of industrial hemp within or outside a State. This language certainly suggests that Congress contemplated there would be both intrastate and interstate transportation and sale of industrial hemp and its seeds, and it undermines the United States' argument the seeds only could be purchased from international sources. Furthermore, this conclusion drawn from the pronouncements in the Spending Bills is consistent with the legislative history and the recently passed 2018 Farm Bill.

Prior to the 2014 Farm Bill, industrial hemp could not be grown in the United States. As a result, the seeds and oil had to be imported. *Hemp Indus. Ass'n v. Drug Enf't Admin.*, 333 F.3d 1082, 1085 n.2 (9th Cir. 2003). When introducing an amendment to H.R. 1947, the Federal Agriculture Reform and Risk Management Act of 2013, to allow colleges and universities to grow and cultivate hemp, Representative Earl Blumenauer (D-OR-3), expressed his frustration with that system by stating:

> "[b]ecause of outdated federal drug laws, our farmers can't grow industrial hemp and take advantage of a more than $300 million dollar market. We rely solely on imports to sustain consumer demand. It makes no sense, . . . . Our fear of industrial hemp is misplaced – it is not a drug. By allowing colleges and universities to cultivate hemp for research, Congress sends a signal that we are ready to examine hemp in a different and more appropriate context."

*Press Release*, Rep. Thomas Massie, House Passes Polis, Massie, Blumenauer Hemp Amendment to Farm Bill (June 20, 2013), https://massie.house.gov/press-release/press-release-house-passes-polis-massie-blumenauer-hemp-amendment-farm-bill (last visited 3/4/19).

On December 20, 2018, the President also signed the 2018 Farm Bill that makes this conclusion unmistakably clear. Agricultural Improvement Act of 2018, Public Law No. 115-334, 132 Stat 4490 ("2018 Farm Bill"). The 2018 Farm Bill expressly allows hemp, its seeds, and hemp-derived products to be transported across State lines. *See* § 10114 of the 2018 Farm Bill (providing "[n]othing in this title or an amendment made by this title prohibits the interstate commerce of hemp (as defined in section 297A of the Agricultural Marketing Act of 1946 (as added by section 10113)) or hemp products"). Additionally, to further clarify the law, Congress finally statutorily removed hemp from the definition of "marihuana" under the CSA and amended 21 U.S.C. § 812(c)(17) to exclude tetrahydrocannabinols in hemp from Schedule I. *See* § 12619

of the 2018 Farm Bill, Conforming Changes to Controlled Substances Act (providing "[t]he term 'marihuana' does not include—(i) hemp, as defined in section 297A of the Agricultural Marketing Act of 1946" and excepting "tetrahydrocannabinols in hemp (as defined under section 297A of the Agricultural Marketing Act of 1946)" from § 812(c)(17)).[10] Congress also ensured that States with approved plans exercise primary control over hemp production. *See* 7 U.S.C. § 1639p(a)(1) ("A State . . . desiring to have primary regulatory authority over the production of hemp in the State . . . shall submit to the Secretary [of Agriculture], through the State department of agriculture . . . a plan under which the State . . . monitors and regulates that production . . . ."). Despite being enacted after the issues in this case arose, the 2018 Farm Bill provides further evidence that Congress did not intend for industrial hemp to be classified as a Schedule I drug.

---

[10]"Marijuana" under the CSA is now defined in full as:

> (16)(A) Subject to subparagraph (B), the term "marihuana" means all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin.
>
> (B) *The term "marihuana" does not include--*
>
> *(i) hemp, as defined in section 1639o of Title 7; or*
>
> (ii) the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination.

21 U.S.C. § 802(16) (2018) (emphasis added).

In light of the language of the 2014 Farm Bill, the Spending Bills, and the legislative history, the Court finds that Congress intended to carve out an exception to the CSA for industrial hemp. *See KAB, LLC v. USPS*, No. MLB 18-39, 2018 WL 4913891 (US Postal Serv. Sept. 21, 2018) ("By choosing to define industrial hemp based upon the concentration of THC in the plant *Cannabis sativa L*, Congress did not amend the CSA so much as carve out a clear exception for industrial hemp[,] . . . [and] Congress clearly 'swept away' the provision of the CSA, at least in so much as it otherwise restricts the growth, cultivation, and marketing of industrial hemp."). Under the 2014 Farm Bill, there is no requirement that hemp seeds be imported from international sources, and it was contemplated that, if in compliance, industrial hemp and industrial hemp seeds could be shipped domestically. As an exception to the CSA, it also was not necessary for qualifying individuals operating under a State's pilot program to be registered with the DEA. Indeed, the 2018 Spending Bill, which was passed before the seeds were shipped in this case,[11] made it clear that Congress did not want enforcement agencies interfering with the growth, cultivating, and marketing of industrial hemp and industrial hemp seeds. Quite simply, industrial hemp is not a controlled substance under the CSA.[12]

---

[11]The Delivery Receipt attached to the Verified Complaint provides that the seeds were picked up on April 24, 2018 and delivered on April 25, 2018.

[12]The United States requests that this Court wait to rule on this issue until after the Fourth Circuit issues an Opinion in *Palomo Farms, LLC v. DEA*, No. 4:17-cv-169-BO, 2018 WL 2768676 (E.D. N.C. Sept. 6, 2018). In *Palomo Farms*, the DEA had issued an importer registration number to the plaintiff, and the plaintiff ordered seeds from an international source. 2018 WL 2768676, at *1. When the seeds arrived at the airport, they were seized by U.S. Customs and Border Protection, and the DEA stated the plaintiff's importer registration number was issued by mistake. *Id*. at *1-2. The plaintiff then filed an action. In considering the arguments by the parties, the district court determined it was without subject matter jurisdiction to resolve the plaintiff's challenge to the DEA's "decision as any such challenge must be brought in the appropriate court of appeals." *Id*. at *3 (citing 21 U.S.C. § 877). These facts are clearly distinguishable from the facts at issue in this case. Therefore, the Fourth Circuit's decision in *Palomo* may not have any impact on this case, and the Court declines to put this case on hold until it is decided.

Nevertheless, the United States argues that Defendants are not shielded from federal enforcement because West Virginia's pilot program required Defendants to buy their seeds from an international source through the WVDA's DEA registration number. In support, the United States attached to the Verified Complaint an undated letter from the Plant Regulatory Programs Coordinator of the WVDA. *Letter from Michael C. Arnold, Plant Reg. Pros. Coord. for the WVDA*, ECF No. 3-6. The two-page letter, which provides guidance on licensing, background checks, and harvesting, also contains a paragraph entitled "Obtaining Seed and Import Permits." *Id*. at 2, ECF No. 3-6, at 3. This paragraph provides the WVDA is registered with the DEA to import hemp seeds internationally. When an international source for seeds is located by an applicant, the applicant must work through Mr. Arnold to get an Import Permit from the DEA. *Id*. In addition, all international orders must be shipped to the WVDA for distribution. *Id*.[13]

---

[13]This paragraph provides in full:

> The Drug Enforcement Administration has issued a registration to the WVDA to import industrial hemp seed from outside the US. It is the applicant's responsibility to locate and purchase seed. When international suppliers are located, all information is passed to me using a "International Seed Source Form" and I will apply for an Import Permit on your behalf. Once approved by the DEA, I will forward the document to your supplier to include with the shipment. All international orders will be shipped to the WVDA's Guthrie Office. At that point I will arrange the distribution of seed to the applicant only. Seed will only be distributed to "**Full License**" holders. First time applicants will take possession of seed at the growing location during a site inspection visit. (*The possibility exists that the WVDA will receive industrial hemp seed for a "Provisional License" holder and not be able to distribute the seed to them. This would occur if the applicant failed to provide the required background checks or did not meet the approval of the WVDA.*)

*Id*.

Upon review, however, the Court finds this paragraph merely explains the process *if* an applicant elects to buy seeds from an international source. There is nothing in this letter that requires an applicant to buy seeds internationally. Likewise, there is nothing in West Virginia's Industrial Hemp Development Act or West Virginia's regulations that requires seeds to be purchased internationally. *See* W. Va. Code §§ 19-12E-1 thru 9; W. Va. C.S.R. §§ 61-29-1 thru -6. Therefore, the Court rejects the United States' argument Defendants were constrained under West Virginia law to buy internationally.

The United States further argues, however, that Mr. Mallory stated in the Hemp Research Project Description submitted to the WVDA that he would be ordering the seeds through the WVDA. *Hemp Research Project Description*, *Application for Research and Marketing Cultivation of Indus. Hemp, Attach. - C*, ECF No. 3-4, at 3. In addition, Mr. Mallory wrote on the application that signs would be erected on the farm to inform the public that the plants contained no THC. *Application for Research and Mktg. Cultivation of Industrial Hemp*, at 1, ECF No. 3-2, at 2. Neither of these things were done. The United States also submitted a handout Mr. Mallory distributed before the seeds were obtained which acknowledges the SOP provides that hemp and hemp seeds cannot be transported across state lines and that the seeds must be imported by those registered with the DEA. *Indus. Hemp from seed to market*, ECF No. 19-6. Thus, the United States asserts it is undeniable that the CAMO Defendants understood the requirement and violated West Virginia's pilot program by not complying with this requirement and for not fulfilling their other obligations.

However, Congress vested authority over such pilot programs with the States and their respective departments of agriculture. *See* 7 U.S.C. § 5940(b)(1)(B)(iii) (2014) (authorizing "State departments of agriculture to promulgate regulations to carry out the pilot program"). Although the United States believes Defendants did not adhere to West Virginia's requirements, it is the obligation of the WVDA, not the United States, to enforce those requirements. Therefore, the Court declines to accept the United States' argument that it should be able to bring an enforcement action against an applicant for what it believes are violations of the WVDA's pilot program. *See KAB*, 2018 WL 4913891, at *5 (citations omitted) (stating Congress gave the States authority over industrial hemp, and "its growth and cultivation does not require DEA licensing for cultivation nor is it subject to DEA oversight").

In fact, as background and not as an underpinning of this Court's legal conclusion, the Court notes that the WVDA rejected the United States' position that the WVDA should take an action against the CAMO Defendants for their alleged violations of the pilot program. On the same day this action was filed, the WVDA sent a letter to the United States Attorney's Office responding to a letter sent by the United States Attorney's Office the previous week. *Letter from Jennifer S. Greenlief, Assistant Commissioner to the WVDA, to L. Anna Forbes, Assistant United States Attorney* (Sept. 11, 2018), ECF No. 19-2.[14] Although the WVDA recognized in the letter that, if the United States Attorney's Office is "convinced that the transport of seed across state lines is illegal, then nothing in . . . [West Virginia law] would purport to shield Mr. Mallory from

---

[14] The letter also mentions that CAMO HEMP WV, LLC was not registered with the West Virginia Secretary of State's Office. *Id.* However, the letter further indicates the permit was issued to Mr. Mallory personally, not to CAMO. *Id.*

prosecution by" the United States, the WVDA rejected the United States' request it summarily revoke Mr. Mallory's permit. *Id*. at 1-2. After reviewing the allegations, the WVDA found insufficient grounds under West Virginia law and the related regulations to revoke the permit. The WVDA specifically stated that "the alleged inaccuracies on Mr. Mallory's application do not rise to the level of materiality that would normally trigger our revocation procedures." *Id*. at 1. Moreover, the WVDA's practice is to allow permit holders to correct any inaccuracies, which is what occurred. *Id*. at 2.[15] Thus, although the United States believed there were material violations of West Virginia's pilot program, the WVDA, which is the department authorized under federal and state law to administer program, did not.

## IV.
## CONCLUSION

Accordingly, for the foregoing reasons, the Court **GRANTS** the Motions to Dismiss by Matthew Mallory and CAMO Hemp WV LLC and Gary Kale and Grass Run Farm, LLC. ECF Nos. 28 & 34. Although the United States also moved for leave to file an Amended Complaint, the proposed changes do not change the fundamental legal flaws in the United States' case that are addressed by the Court in this Memorandum Opinion and Order. Therefore, the Court

---

[15] Adhering to its practice of allowing permit holders to file corrections, the WVDA sent Mr. Mallory a letter three days later asking him to respond to inaccuracies in his application about purchasing the seed from the WVDA and placing signs on the property. *Letter from Jennifer S. Greenlief to Matthew Mallory* (Sept. 14, 2018), ECF No. 25-2, at 17. The letter requested Mr. Mallory to correct these errors or the WVDA "may" take an action against his license. *Id*. at 1. On September 21, 2018, Mr. Mallory responded and said CAMO originally intended to purchase seeds through the WVDA, but the foreign seeds were shown to have low germination rates. *Letter from Matthew Mallory to Jennifer S. Greenlief* (Sept. 21, 2018), ECF No. 25-1, at 1. As a result, CAMO had to find another supplier, and it verbally disclosed this change at the time. *Id*. With respect to the signage, Mr. Mallory stated that CAMO had enacted a new policy because it was learned that signs attracted unwelcome attention to sites. Instead of signs, CAMO had workers, who were on the sites on a daily basis, provide security. *Id*. Mr. Mallory also attached an updated Application for Research and Marketing Cultivation of Industrial Hemp to the letter.

**DENIES AS FUTILE** the United States' Motion for Leave to File an Amended Verified Complaint for Declaratory Relief; Temporary, Preliminary, and Permanent Injunctive Relief; Asset Forfeiture; and Civil Penalties. ECF No. 48. *See Save Our Sound OBX, Inc. v. N. Carolina Dep't of Transp.*, 914 F.3d 213, 228 (4th Cir. 2019) (citation omitted) ("Courts may deny leave to amend a pleading if the amendment would have been futile."). On the other hand, as the Court did cite the supplemental case submitted by the CAMO Defendants, the Court **GRANTS** their Motion for Leave to File Supplemental Authority.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER: March 6, 2019

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE